JOSEPH J. JERMYN, Respondent, *v.* FREDERICK F. SEARING et al., Copartners under the Firm Name of SEARING & COMPANY, Defendants, and THE EMPIRE TRUST COMPANY, Appellant.

Stock subscriptions — construction of agreement proposed to be entered into by a syndicate composed of subscribers of bonds to be issued to build a proposed railroad and the railroad promoters as managers of the proposed syndicate — when such agreement signed by only one subscriber for bonds does not authorize promoters to borrow money on strength of such subscription — when subscriber who is not liable for such loan may have agreement and subscription canceled.  .

1. In the absence of estoppel the party who has given an authority in writing is right in asking that that authority be followed as it is stated, and not as the other parties thought he would be willing they should use it. Nothing can be added to or read into the agreement unless there be an ambiguity which gives play for judicial interpretation.

2. Agreements to subscribe for the stock of a corporation to be formed presuppose the organization of the corporation before they become binding and enforceable. In the absence of express authority to borrow upon an individual subscription to buy bonds, the agreement to subscribe assumes the incorporation of the binding company and that it will not be enforceable until that time.

3. In order to carry out a scheme to construct a proposed railway and acquire the stock and bonds of two railroads, one built and one projected, to be amalgamated into one system with the proposed railway, an agreement was proposed to be entered into by a syndicate composed of the subscribers for the bonds to be issued in order to finance the scheme and a firm of promoters as managers of the syndicate. The syndicate was to apply the proceeds of such bonds to the construction of the proposed railway and do all things its managers deemed fit to accomplish that purpose, including the right to arrange for advances to be made from time to time upon the security of the agreement for building the railroad. The plaintiff herein alone signed such agreement as a subscriber to a designated number of bonds, a small part of the number proposed to be issued. Upon these facts, it cannot be held that loans were to be

procured upon the strength of such agreement before the contemplated railway was incorporated or bonds issued or authorized to be issued.

4. Where the managers of the proposed syndicate, without the knowledge of plaintiff, procured a loan upon their note as managers secured by the subscription agreement signed by plaintiff, part of which loan was used to repay another loan made by said trust company to said promoters over a month before the plaintiff signed the agreement, the plaintiff is not obligated under such subscription to reimburse the trust company for the loan to the promoters, who are insolvent, but is entitled to have the agreement canceled.

*Jermyn* v. *Searing*, 170 App. Div. 707, affirmed.

(Argued January 29, 1919; decided February 25, 1919.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered January 10, 1916, affirming a judgment in favor of plaintiff entered upon a decision of the court on trial at Special Term.

The action was to obtain the revocation of a subscription to a syndicate agreement upon the grounds that plaintiff's subscription was obtained by fraud, without consideration; that it had been revoked; that no syndicate was ever formed and that there were no other subscribers. The answer set up a counterclaim for money alleged to have been loaned upon the strength of said subscription.

The facts, so far as material, are stated in the opinion.

*William D. Guthrie* and *Thomas F. Gilroy, Jr.,* for appellant. Searing & Co. had authority as syndicate managers to borrow money for construction purposes or the acquisition of securities. (*Minot* v. *Burroughs*, 223 Mass. 595; *Keyes* v. *Met. Trust Co.*, 220 N. Y. 237; *Le Roy* v. *Beard*, 8 How., U. S., 451; *Very* v. *Levy*, 13 How. Pr. 345, 358; *Jackson* v. *Builders Wood Working Co.*, 91 Hun, 435; *Hoffman* v. *Ætna Ins. Co.*, 32 N. Y. 405; *N. Y. & New Haven R. R. Co.* v. *Schuyler*, 34 N. Y. 30; *Bank of Batavia* v. *N. Y., L. E. & W. R. R. Co.*, 106 N. Y. 195; *Provident Trust Co.* v. *Mercer County*,

170 U. S. 593; *Waite* v. *Santa Cruz*, 184 U. S. 302; *Gunnison County Commissioners* v. *Rollins*, 173 U. S. 255; *Pendleton County* v. *Amy*, 13 Wall. 297.) The revocation of an agent's authority is not effective as against innocent third parties unless brought to their attention. (*N. Y. & N. H. R. R. Co.* v. *Schuyler*, 34 N. Y. 30; *F. L. & T. Co.* v. *Wilson*, 139 N. Y. 284; *McNeilly* v. *Cont. Life Ins. Co.*, 66 N. Y. 23; *Claflin* v. *Lenheim*, 66 N. Y. 301; *Glennan* v. *Rochester Trust & S. D. Co.*, 209 N. Y. 12; *Hatch* v. *Coddington*, 95 U. S. 48; *Johnson* v. *Christian*, 128 U. S. 374; *Wood* v. *Duff-Gordon*, 222 N. Y. 88; *Horton* v. *Erie Preserving Co.*, 90 App. Div. 255; 181 N. Y. 535; *Hutchins* v. *Smith*, 46 Barb. 236; *Hess* v. *Rau*, 95 N. Y. 359; *Farrell* v. *Amberg*, 8 Misc. Rep. 220; 151 N. Y. 670.) The subscription agreement was a binding and certain contract between the plaintiff and Searing & Co., and was supported by sufficient consideration in the express and implied promises of and obligations and duties assumed by Searing & Co. (*Wood* v. *Duff-Gordon*, 222 N. Y. 88; *Godine* v. *Kidd*, 64 Hun, 585; *Catlin* v. *Green*, 120 N. Y. 441; *Singer Co.* v. *Union Co.*, Holmes, 253; *Philadelphia Ball Club, Ltd.*, v. *Lajoie*, 202 Penn. St. 210; *Industrial & General Trust, Ltd.*, v. *Tod*, 180 N. Y. 215; *Moran* v. *Standard Oil Co.*, 211 N. Y. 187; *Folliard* v. *Wallace*, 2 Johns. 395; *Horton* v. *Erie Preserving Co.*, 90 App. Div. 255; 181 N. Y. 535; *Hutchins* v. *Smith*, 46 Barb. 235; *Levy* v. *West Side Const. Co.*, 162 N. Y. Supp. 661.) The agreement to pay the " managers " the amount set opposite their respective names, set forth in the second clause, is assumed by the subscribers, *i. e.*, by each subscriber severally for himself and to the extent only of the amount of his individual subscription. The express authority to arrange for advances is upon the security of this agreement, and not upon the security of the whole syndicate. (*Sandford* v. *Halsey*, 2 Den. 235; 25 Wend. 475; *Ada*

*Dairy Assn.* v. *Mears,* 123 Mich. 470; *Wood* v. *Duff-Gordon,* 222 N. Y. 88; *Railroad* v. *Kinsman,* 77 Maine, 370; *Phœnix Warehousing Co.* v. *Badger,* 67 N. Y. 294; *Hastings Lumber Co.* v. *Edwards,* 188 Mass. 587; *Yonkers Gazette Co.* v. *Taylor,* 30 App. Div. 334; *Knickerbocker Trust Co.* v. *Davis,* 143 Fed. Rep. 587; *C. & C. R. R. Co.* v. *Garland,* 14 S. C. 63; *Gibbons* v. *Ellis,* 83 Wis. 434.)

*Reid L. Carr* for respondent. The syndicate agreement gave no power to Searing & Co., as syndicate managers or as agents for plaintiff, to borrow money on his account or for the repayment ·of which he would be liable. (*Delafield* v. *State,* 26 Wend. 191; *Shaw* v. *Saranac Horse Nail Co.,* 144 N. Y. 220; *Craighead* v. *Peterson,* 72 N. Y. 279; *Smith* v. *Tracy,* 36 N. Y. 79; *Lawrence* v. *Gebhard,* 41 Barb. 575; *Guardian Trust Co.* v. *Peabody,* 122 App. Div. 648; 195 N. Y. 544; *Porges* v. *United States Mortgage & Trust Co.,* 203 N. Y. 181; 1 Clark & Skyles on Agency, 267; 31 Cyc. of Pl. & Pr. 1395; *Bray* v. *Farwell,* 81 N. Y. 600.) No effort was made and no intention formed by any of the defendants to lend or borrow money for Jermyn's account and no promise was given or pretended to be given on his behalf to repay the loan of April second. No privity of contract was created· or attempted to be· created between Jermyn and the trust company. There was a complete failure of proof as to the counterclaim. (*Paige* v. *Willett,* 38 N. Y. 28; *Ferriss* v. *Hard,* 135 N. Y. 354; *Bradt* v. *McClenahan,* 118 App. Div. 768; *Guaranty Trust Co.* v. *Dinwiddie,* 79 Ore. 653; *Atty.-Gen.* v. *Drummond,* 1 Dr. & War. 368; *Sturm* v. *Boker,* 150 U. S. 312, 336; *Insurance Co.* v. *Dutcher,* 95 U. S. 269; *Nicoll* v. *Sands,* 131 N. Y. 19; *Seymour* v. *Warren,* 179 N. Y. 1, 6; *Rowland* v. *Hall,* 121 App. Div. 459.) The syndicate agreement pledged with the Empire Trust Company as collateral security was subject to all equities and defenses available against Searing &

Co., and the trust company as pledgee acquired no greater right to enforce it than Searing & Co. possessed. (*Rapps* v. *Gottlieb*, 142 N. Y. 164; *Stevenson Brewing Co.* v. *Iba*, 155 N. Y. 224; *Central Trust Co.* v. *W. I. Imp. Co.*, 169 N. Y. 314; *Selwyn* v. *Waller*, 212 N. Y. 513; *Guaranty Trust Co.* v. *Dinwiddie*, 79 Ore. 653; *Wing* v. *McCallum*, 244 Fed. Rep. 199.) Plaintiff was not bound by the syndicate agreement because his subscription was for twenty out of a total of six hundred syndicate shares and no other person ever subscribed for a single share. (*Bray* v. *Farwell*, 81 N. Y. 600; *Pitchford* v. *Davis*, 5 M. & W. 2; *Cabot & West Springfield Bridge* v. *Chapin*, 6 Cush. 50; *Stoneham Branch R. Co.* v. *Gould*, 68 Mass. 277; *Salem Mill Dam Corp.* v. *Ropes*, 6 Pick. 23; *Atlantic Cotton Mills* v. *Abbott*, 9 Cush. 423; 1 Cook on Corp. [6th ed.] § 176; 2 Clark & Marshall on Corp. § 505.) Jermyn was never bound by the agreement because it was void for want of consideration and want of mutuality. (1 Page on Cont. 452; *Green* v. *Sigua Iron Co.*, 88 Fed. Rep. 203; 88 Fed. Rep. 207; 104 Fed. Rep. 854; *Lerner* v. *Tetrazzini*, 71 Misc. Rep. 182; 144 App. Div. 928; 207 N. Y. 709; *Chicago R. Co.* v. *Dane*, 43 N. Y. 240; *Commercial Co.* v. *Northampton P. C. Co.*, 115 App. Div. 388; 190 N. Y. 1; *Howie* v. *Kasnowitz*, 83 App. Div. 295; *Thayer* v. *Burchard*, 99 Mass. 508; *Goodyear* v. *Koehler*, 159 App. Div. 116; *Barrow* v. *Mexican R. Co.*, 134 N. Y. 15; *Rehm-Zeither Co.* v. *Walker*, 160 S. W. Rep. 777; *Arnot* v. *Pittston Coal Co.*, 68 N. Y. 565.)

CRANE, J. Joseph J. Jermyn at all the times herein mentioned was a wealthy mine owner, resident in Scranton, Pennsylvania. Searing & Co. was a copartnership carrying on a banking and promoting business with offices at 7 Wall street, New York city.

The Empire Trust Company was a banking corporation of New York city which acted as trustee under mortgages

34

to secure the bonds issued or to be issued by the four railroads hereinafter mentioned.

· The Delaware and Eastern Railroad Company was organized and incorporated in November, 1904, under the laws of the state of New York with an authorized capital of $600,000, to own and operate about forty-eight miles of railroad extending from the village of East Branch to the village of Arkville with a spur from Shavertown to Andes, all in the county of Delaware, New York state. Construction was commenced in September of 1905 and continued to completion in September of 1907. $1,000,000 par value first mortgage bonds were issued by this railroad company, $600,000 of which were placed by Searing & Co. upon the market.

The Empire Trust Company was the trustee under the mortgage to secure these bonds executed on or about January 1st, 1906.

The Hancock and East Branch Railroad was organized on July 11th, 1906, with a capital stock of $200,000, for the purpose of building a railroad from Hancock to East Branch, a distance of about seven miles. On or about January 2d, 1907, it executed a mortgage to the Empire Trust Company to secure an issue of its bonds with the par value of $1,000,000. The mortgage was never recorded and no bonds were ever issued.

The Schenectady and Margaretville Railroad Company was organized on July 26th, 1906, with a capital stock of $1,000,000, for the purpose of building and operating a railroad from the village of Arkville to the city of Schenectady. Arkville was one of the termini of the Delaware and Eastern Railroad Company. On the 2d day of January, 1907, it executed a mortgage to the Empire Trust Company to secure an issue of its bonds at the par value of $4,500,000. The mortgage was never recorded and the bonds were never issued.

It will thus be seen that with the construction of these

two latter railroads there would be a continuous line from Schenectady to Hancock on the Pennsylvania border in the state of New York.

Searing & Co., the promoters, began to survey and lay grades in or about June of 1906 for these two railroads, or, as it might be termed, the extension under separate corporate entities of the Delaware and Eastern Railroad from Arkville on the east and East Branch on the west.

The Delaware and Eastern *Railway* Company was incorporated about May 13th, 1907, with a capital stock of $1,200,000, for the purpose of consolidating the three railroads above mentioned so as to give it the full control and management of the system between Schenectady and Hancock.

On July 1st, 1907, this *railway* company executed and delivered a mortgage to the Empire Trust Company as trustee to secure the issue of bonds to the amount of $6,500,000, which were to be used for the purpose of retiring the outstanding bonds and stock of the Delaware and Eastern Railroad Company, the bonds of the Schenectady and Margaretville Railroad Company and for the other general purposes of the railway company.

This litigation grows out of a loan of $150,000 which the Empire Trust Company made to Searing & Co. as managers of a syndicate on a subscription agreement for $200,000 of these bonds of the Delaware and Eastern *Railway* Company signed by the plaintiff, Jermyn. The question is, who is to lose this money, the subscriber or the banking institution which loaned on his subscription.

Searing & Co. became bankrupt on February 24th, 1910, and the Delaware and Eastern Railway Company went into the hands of a receiver two days later.

In my judgment the result of this case depends upon the interpretation of Jermyn's subscription agreement, and to understand the question presented it is necessary to state some additional facts.

In June of 1905 Jermyn, through the solicitation of Searing & Co., purchased $100,000 par value of the bonds of the Delaware and Eastern Railroad Company (not Railway), paying cash therefor. He received at the time two hundred and fifty shares of the stock as a bonus. On August 15th of 1906 the plaintiff agreed to buy an additional $100,000 of these bonds, but instead of paying cash therefor, authorized Searing & Co. to obtain a loan of $95,000 with which to pay the purchase price, $85,000 from the Empire Trust Company and $10,000 from the Newton Trust Company of Newton, New Jersey. Searing & Co. were to sell these bonds and out of the proceeds pay the loans and keep the profits. As security for this loan of $85,000 from the Empire Trust Company, Jermyn gave his demand note which was called for payment on the 21st day of March, 1907. When the plaintiff on the 26th day of March, 1907, called at the trust company in reference to this demand he told its president of the arrangement he had made with Searing & Co. whereby they were to sell the bonds and out of the proceeds pay the note. He recognized, however, his obligation and paid $30,000 on April 1st, 1907, $40,000 July 15th, 1907, and the balance, $15,000, on August 20th, 1907, at which time the president wrote him a letter of thanks stating that the bonds taken as security would be shipped according to instructions.

Thus the plaintiff by August of 1907 had paid in cash for $200,000 of the bonds of the Delaware and Eastern Railroad Company. His first subscription was made by signing an agreement in writing somewhat similar to that hereinafter mentioned and which forms the dispute in this case.

This litigation is over the second agreement signed March 12th, 1907, by the plaintiff when he subscribed for bonds amounting to $200,000 of the Delaware and Eastern *Railway* Company. On April 2d, 1907, Searing

& Co. obtained from the Empire Trust Company a loan of $150,000 upon the strength of this subscription paper using it as collateral for the loan. The plaintiff knew nothing about this transaction until March of 1908, when demand was made upon him for payment which he refused. The facts so far as material regarding this loan may be briefly stated.

When on March 26th Mr. Jermyn was in New York consulting the Empire Trust Company about his $85,000 loan which had been called, one of the firm of Searing & Co. was in Scranton, Pennsylvania, seeking to borrow of the Dime Deposit and Discount Bank of that place $50,000 on this second subscription agreement. Learning of this fact upon his return home on the 27th, Jermyn immediately repudiated any right of Searing & Co. to borrow on this paper and wrote them a letter on the 28th canceling his subscription. On the 30th of the month Searing & Co. wrote a letter to Mr. Baldwin, president of the Empire Trust Company, in which they stated this proposition:

" For you to make us a loan of one hundred and fifty thousand dollars ($150,000) for three months with the privilege of renewing it for another three months, on our note to be secured by an underwriting agreement with Mr. J. J. Jermyn for two hundred thousand dollars ($200,000) par value of bonds of the Delaware and Eastern Railway Company Syndicate."

On April 2d the Empire Trust Company made the loan by paying to Searing & Co. as managers of the Delaware and Eastern Railway syndicate the sum of $150,000, taking as security their note as such managers, the subscription agreement signed by Jermyn and a few days later four calls upon Jermyn for payment of his subscription to be used only in case Searing & Co. failed to meet their note. The note thus given was for three months and was renewed from time to time until pay-

ment was demanded February 27th, 1908. Fifty thousand dollars ($50,000) of the amount loaned was immediately returned to the Empire Trust Company to take up a previous note of Searing & Co. given together with securities of the Delaware and Eastern Railroad Company for a loan obtained February 5th, 1907, over a month before the plaintiff became a subscriber to the bonds of the *railway* company.

Having these facts before us the point presented may be stated briefly as follows: The plaintiff signed a subscription agreement under which Searing & Co. claimed to have the right to borrow money of the Empire Trust Company. Did the paper contain such authority? The trial court has found that the subscription agreement was without consideration or mutuality, was void for fraud and also subject to a collateral agreement made between the plaintiff and Searing & Co. that the subscription should not be binding unless or until all the shares of the proposed syndicate or all the $6,000,000 bonds should be subscribed for. We take it, however, that none of these facts would be a good defense as against the Empire Trust Company acting in good faith without knowledge, if the subscription agreement authorized Searing & Co. to borrow and the Empire Trust Company to loan under the conditions and circumstances stated. The court found, and was justified in so finding, that the trust company acted in all these matters in absolute good faith. We must, therefore, examine this syndicate agreement to find the authority if it exists.

March 12th, 1907, is the date of the contract headed, " Delaware and Eastern Railway Co." — " Syndicate Agreement." The parties of the first part are Searing & Co. and the parties of the second part are the " subscribers hereto " called the " subscribers " and collectively the " syndicate." The recitals contain a statement that the parties of the first part have " acquired the rights

to the control of six million dollars ($6,000,000) 5% bonds of a company about to be formed to be known as the Delaware and Eastern Railway Co. or by some other name," and that the parties desire to form a " syndicate " to purchase the said six million dollars of bonds of said company. Then follows the agreement said to be made between the parties of the first part " who are to be the managers of the syndicate and the syndicate." It will be noticed that the agreement is not between Searing & Co. and a " subscriber " individually, but between said firm, as managers and the " syndicate " the " subscribers," the party of the second part. The purpose is to buy six million dollars of bonds of a company *about* to be formed. After specifying the number of shares of the company, the number · the respective subscribers agree to take, a copy of the negotiable receipt to be given upon payment of the subscriptions, the right of the managers to reject or reduce any subscription there follows paragraph " seventh " in these words:

" It is understood that the bonds of the present underwriting are for the purpose of constructing a line from Hancock, N. Y., to Schenectady, N. Y., by acquiring all the stock and all the bonds of the Hancock and East Branch Railroad Company and the Schenectady and Margaretville Railroad Company authorized by the Board of Railroad Commissioners and all the rights, privileges and franchises now granted to these companies, and also to acquire, by lease or otherwise, the present Delaware and Eastern Railroad Company, already constructed and operated, amalgamating the three railroads into one system, to be known as the Delaware and Eastern Railway Company, or by some other appropriate name.

" And, the ' Subscribers ' hereto do hereby consent and the ' Managers ' are hereby empowered to do any and all acts, to purchase any other securities, and to

apply the proceeds of the within underwriting in any manner which, in their judgment, they may deem fit in order to accomplish the above purpose, including the right to arrange for advances to be made from time to time to the Contractors or Construction Company that may hereafter be formed to build the said Railroad, by one or more Banks or Trust Companies, upon the security of this agreement, if necessary, together with the bonds and certificates subscribed for hereunder or that may be purchased by the 'Managers' with the proceeds of the within underwriting."

Who gives to the managers the power to purchase and arrange with trust companies for advances? The "subscribers" the "party of the second part" also called "the syndicate." I find nothing in this agreement constituting one subscriber a "syndicate" or the "party of the second part." No authority is here conferred by an individual subscriber to borrow money on his name; it is the syndicate which empowers advances to be arranged for "upon the security of this agreement." The agreement mentioned is that to which Searing & Co. are one party and the syndicate or subscribers the other party. The fact that subscriptions may have been taken on separate sheets of paper cannot alter the legal effect. The contract consists of all such papers taken together. It is quite evident that there was to be no agreement, no power to bind the individual until the party of the second part came into being and the syndicate was formed. If the contrary was the intention it could have been so stated as in *Knickerbocker Trust Co.* v. *Evans* (188 Fed. Rep. 549); *Knickerbocker Trust Co.* v. *Davis* (143 Fed. Rep. 587).

When this paper was presented to the Empire Trust Company to obtain a loan of $150,000 what was to be seen and read? In the first place it bore simply the plaintiff's signature for $200,000 of the bonds. No one

else had signed it and no statement was made that any other subscriptions had been procured. So far as the trust company knew this was the only subscription. It stated that the bonds subscribed for were for the purpose of constructing a line from Hancock to Schenectady in the following manner:

By acquiring the stocks, bonds and franchises of the Hancock and Eastern Branch Railroad Company and the Schenectady and Margaretville Railroad Company and to acquire by lease or otherwise the existing Delaware and Eastern Railroad Company. It stated without reservation, although such was not the fact, that this latter railroad was " already constructed and operating." The amalgamation was to be known as the Delaware and Eastern Railway Company. Then the subscribers gave to the managers certain powers and they were these:

1st. To purchase *any other* securities (this did not mean the securities above mentioned). 2nd, to apply the proceeds of the within underwriting in any manner they deemed fit.

Next came the authorization to borrow money, the right to arrange for advances from time to time from banks and trust companies. This was limited as follows:

(a) The advances were to be to contractors. This could hardly have meant Searing & Co. as they had been referred to throughout the agreement as " managers." Something other must have been meant than the managers, or this word would have been repeated. The " contractor " meant the person contracting to build the extensions to the road.

(b) The advances were to build the new railway. This did not mean to build the Delaware and Eastern Railroad, for it was stated in the preceding paragraph that such road was " already constructed and operating." This had reference to the two additional lines above

referred to which were to connect at either end with the Delaware and Eastern Railroad, as built or as being constructed. While this road had not actually been finished, yet as the agreement stated that it was, this indicated at least an intention that the money of the new syndicate, or at least that which was to be borrowed, was not to be used to complete it.

(c) The advances were to be made " upon the security of this agreement, if necessary, together with the bonds and certificates subscribed for hereunder." It could hardly be supposed that loans were to be procured upon the strength of a subscription agreement before any railroad such as contemplated was incorporated or bonds issued or authorized to be issued. It says that if necessary the subscriptions may be used to obtain money *together* with the bonds. While this might not require the bonds to accompany the agreement, yet in the most liberal interpretation it was expected that the corporation should be formed and the bond issue authorized.

Agreements to subscribe for the stock of a corporation to be formed presuppose the organization of the corporation before they become binding and enforceable. It may not be that the subscriptions must be full and complete before the contract of a subscriber can be enforced, but the corporation when formed is generally the party to enforce the agreement. (*Marysville Electric Light & Power Co.* v. *Johnson*, 93 Cal. 538; *Ashuelot Boot & Shoe Co.* v. *Hoit*, 56 N. H. 548; *Athol Music Hall Co.* v. *Carey*, 116 Mass. 471; *International Fair & Exposition Assoc. of Detroit* v. *Walker*, 83 Mich. 386.)

In the absence of express authority to borrow upon the individual subscription to buy bonds, the agreement to subscribe assumes the incorporation of the bonding company and that it will not be enforceable until that time.

What was said in *Dorris* v. *Sweeney* (60 N. Y. 463, 467) about a stock subscription is not inappropriate here. The

defendant in that case signed an instrument whereby he and others agreed to form a company for the purpose of purchasing a patent for preserving fruits and vending the same and to pay for the amount of stock set opposite their respective names. Five thousand dollars was subscribed by the defendant. The company when formed also included the purpose of manufacturing preserved fruits and of canning fruits. This court said: " A legal and effectual formation of a corporation or joint stock company for the purpose specified in the contract was a condition precedent to his obligation to put in his capital. He would not be bound under such a contract to invest his capital in the stock of a corporation not legally formed, or which had not obtained the franchise of carrying on the business contemplated by the contract, and in which he had agreed to become interested." (See, also, *Buffalo & Jamestown R. R. Co.* v. *Gifford,* 87 N. Y. 294; *Buffalo & Allegany R. R. Co.* v. *Cary,* 26 N. Y. 75.)

The loan made, in this case, was to Searing & Co. and not to any contractor. It was not for the purpose of building the extensions, above referred to. The trust company knew that $50,000 of it was to repay a previous loan obtained a month before the subscription agreement was signed. The Delaware and Eastern Railway Company was not at the time incorporated for it did not come into existence until May 13th, 1907, and no bonds were issued or authorized to be issued until after July 1st, 1907. Searing's letter to President Baldwin, March 30th, 1907, stated:

" We now have our lines out arranging the underwriting for this new proposition and have already made a very substantial start. We will not begin any construction work until we have the funds in hand to complete the Hancock and East Branch division."

Therefore, we must conclude that this contract did not authorize Searing & Co. to obtain money from the

Empire Trust Company for and on behalf of Jermyn at the time and under the conditions stated, and that a plain reading of the paper in the light of the known facts so indicated to the trust company.

We have not overlooked the force of the sweep of the appellant's argument that this was one railroad enterprise undertaken to connect Schenectady with Hancock, and that all the moneys raised at any time were devoted or to be applied to the one cause irrespective of the three or four separate corporations. This may be the natural way in which the business man would look at it. Viewed in optimism and hope no doubt many great undertakings would not be finished if the organizers stopped at every step to examine too closely the obstacles. Success often overlooks faults and the law is not always quick enough for some necessary action. Failure, however, is critical and scans the letter as well as the spirit of an agreement.

So here, it may very well be that the parties understood this to be the building of a single railroad and that the four corporations were but a means to one end, that the two separate syndicates which had been formed· were in essence but one and that a loan obtained at any time and used for the common purpose was justifiable. Yet when the scheme failed the parties naturally turned to the writings as a chart of powers and liabilities. In the absence of estoppel the party who has given an authority in writing is right in asking that that authority be followed as it is stated and not as the other parties thought he would be willing they should use it. As above indicated there was no authority given Searing to borrow the money as was done and the loss must fall upon the trust company.

Appellant's counsel in his brief states that in order for his client to win, the agreement must be read in the light of the purposes and objects to be accomplished, and that " the terms used are in some respects artificial

and inapt." Of course nothing can be added to or read into the agreement unless there be ambiguity which gives play for judicial interpretation. We find no such ambiguity.

If we pass this question of authority to obtain advances and consider the agreement as an assignment or collateral security for the loan to Searing & Co., then we would be inclined to some of the views expressed by the counsel for the trust company. Thus, we do not believe that the findings show any fraudulent misrepresentations regarding the right to control the $6,000,000 bond issue. It was evident on the face of the papers that the syndicate was in the process of formation, that Searing & Co. were the promoters and organizers and were to create the corporation and procure the bonds. The right to control spoken of was not the expression of a past fact upon which to base fraud, but rather the expression of antici-pated results due to the promoters' activities. They were to get subscribers and sell the bonds. It is evident that there could be no false representations upon which Jermyn relied under these circumstances.

Neither do we think there was such lack of mutuality or consideration upon the face of the paper as to make the agreement void. We would, however, be bound by the unanimous finding that there was a collateral agree-ment between Jermyn and Searing that the subscription would not be binding until the full amount had been subscribed, and as this would be a good defense against Searing & Co. it also would be sufficient as against third parties. The collateral was non-negotiable, open to all the equities in the hands of innocent purchasers, existing between the original parties.

However, we need not pass upon this branch of the case as the appellant concedes that its right to recover, if at all, is based upon the authority in the syndicate agreement to borrow money upon the credit of Jermyn. It asserts its rights as one who made a loan to the syndi-

cate upon the faith of an authority conveyed in the underwriting agreement upon Searing & Co. as syndicate managers.    We find, as already stated, no such authority as used at the time and under the circumstances presented.

Some rulings of the trial court have been called to our attention and we also are in accord with much that the counsel for the appellant has stated about them.

No doubt it is somewhat annoying to have the trial court express a decided view that the written paper gave Searing & Co. the authority to borrow money of the Empire Trust Company and then subsequently change about and decide the other way, but this is one of the irritations of litigation and the frailities of the human mind.

Then, too, much evidence was received as against Searing & Co. not competent as against the Empire Trust Company but which it is stated was subsequently used as against the latter in forming the decision.    Even if this should be true no question is presented which we can pass upon in view of the unanimous affirmance.    The evidence was competent against one defendant and could not be excluded.    If we are bound by findings, although there be no evidence to sustain them, we would likewise be bound where the findings are based upon evidence received as against one party only, but used for conclusions against the other.    This would be a matter for the Appellate Division in reviewing the evidence and not for this court.

Evidence might well have been received showing all that Searing & Co. had done in building the railroad, the amount of money expended and the other subscribers obtained or solicited, but we are convinced that the exclusion of this evidence was harmless in view of our opinion on the main question of authority.    Some of the findings are inconsistent, but taking those most favorable to the appellant we have arrived at the conclusion already stated.

We have not failed to note the jealous earnestness of counsel for the honor of his client as well as its financial benefit, but surely this is satisfied by the findings in all the courts to which we give our final approval that it acted in all these matters with the utmost good faith. The judgment should be affirmed, with costs.

HISCOCK, Ch. J., COLLIN, CUDDEBACK, CARDOZO and POUND, JJ., concur; ANDREWS, J., concurs in result.

Judgment affirmed.