NATIONAL EXHIBITION COMPANY, A CORPORATION, PLAINTIFF, RE-SPONDENT, v. THE CITY OF ST. LOUIS, A MUNICIPAL CORPORATION; BERNARD F. DICKMANN, MAYOR; FRED A. RENICK, LICENSE COL-LECTOR; JOHN H. GLASSCO, CHIEF OF POLICE; LOUIS NOLTE, COMPTROLLER; ALBERT BOND LAMBERT; THOMAS L. FARRINGTON; SAMUEL H. LIBERMAN AND OTTO F. HARTING, POLICE COMMIS-SIONERS, ALL OFFICERS OF THE CITY OF ST. LOUIS, MISSOURI, DE-FENDANTS, APPELLANTS.—136 S. W. (2d) 396.

St. Louis Court of Appeals. Opinion filed February 6, 1940.

486

*Carter & Jones* and *Richard S. Bull* for respondent.

*Edgar H. Wayman, Oliver Senti* and *Andrew J. Reis* for appellants.

McCULLEN, J.—This suit for an injunction was brought by respondent, as plaintiff, against appellants City of St. Louis and certain of its officers, as defendants, to restrain defendants from enforcing the provisions of an ordinance of the City of St. Louis imposing a license fee upon circuses and menageries. After a trial, the court rendered judgment granting plaintiff a permanent injunction. On October 10, 1938, defendants duly appealed to this court, filing their

bill of exceptions in the circuit court on March 2, 1939. The cause was argued and submitted in this court in October, 1939.

No question is raised as to the pleadings, hence they need not be set forth here.

A stipulation of facts was filed in the trial court upon which the cause was submitted together with the Exhibits A and B referred to therein.

It appears from the record that plaintiff was the owner of the premises located at 5700 Oakland Avenue in the City of St. Louis, on which there was a building known as the Arena. On October 21, 1929, plaintiff entered into a lease agreement (Exhibit A) with the Western Show Company, Inc., for the use by that company of certain portions of plaintiff's building from 1:00 o'clock A. M., Tuesday, December 3, 1929, to 1:30 A. M., Monday, December 16, 1929. The lessee show company agreed in said lease to exhibit daily, from the 5th to the 15th of December, 1929, inclusive, at least two complete performances of its exhibition referred to as ''Miller Brothers 101 Ranch Show.'' By the terms of said lease, the parties thereto agreed that the lessor would receive 33-1/3 per cent., and the lessee 66-2/3 per cent., of the gross receipts of admission charges, and the lessee agreed to comply with all laws and regulations and to obtain all necessary permits and licenses. The lease provided that ''the costs of a circus, or exposition, permit shall be deducted from the gross receipts of this lease before said gross receipts are divided between the parties as hereinbefore specified.''

At the time the lease was signed and during the period of time that the lessee occupied plaintiff's premises under the lease, plaintiff was the holder of a license duly issued by the license collector of the City of St. Louis under paragraph eighth of section 1383 of the 1926 Revised Code of the City of St. Louis, plaintiff having paid the sum of $150 for said license, which covered a period of one year. Said section of the Revised Code provides as follows:

''Section 1383. . . . There shall be levied and collected for every license granted for any business or object herein specified as follows: . . . Eighth. Upon a license for theaters, theatrical exhibitions, museums, or any other exhibition, show or amusement where an admission fee is charged: For one month, twenty-five dollars; for three months, seventy-five dollars; for six months, one hundred dollars; for one year, one hundred and fifty dollars.''

Defendant City of St. Louis, through its license collector, claimed that the exhibition which was to be given by the plaintiff and the Western Show Company at the Arena came within the provision of paragraph seventh of said section 1383 of the Revised Code of 1926 of the City of St. Louis, which provides as follows:

''Section 1383. . . . There shall be levied and collected for every license granted for any business or object herein specified as

follows: . . . Seventh. For each circus, circus or menagerie, or menageries in which such entertainment is to be given, which has a seating capacity sufficient to accommodate more than five thousand (5,000) persons, the license fee shall be one hundred fifty dollars ($150) per day; more than three thousand (3,000) persons, but not more than five thousand (5,000) persons, one hundred dollars ($100) per day; more than fifteen hundred (1500) persons, but not more than three thousand (3,000) persons, fifty dollars ($50) per day; more than seven hundred and fifty (750) persons, but not more than fifteen hundred (1500) persons, thirty-five dollars ($35) per day; more than four hundred (400) persons, but not more than seven hundred fifty (750) persons, fifteen dollars ($15) per day; not more than four hundred (400) persons, ten dollars ($10) per day.''

On December 6, 1929, plaintiff instituted this suit to prevent the license collector and other officers of the City of St. Louis from enforcing the provisions of the above-mentioned paragraph seventh of the Revised Code against the persons who were in charge of the exhibition at the Arena. The license collector at that time was claiming and demanding from plaintiff payment to the City of St. Louis of a license fee of $150 a day for the continuance of the exhibition of the 101 Ranch Show, and was threatening the arrest and prosecution of the persons in charge of such exhibition unless a license fee of $150 per day was paid.

The stipulation of the parties herein states that, at the time plaintiff's petition was filed, there was in progress at plaintiff's building, in accordance with the lease mentioned, an exhibition known as ''The 101 Ranch,'' which was ''a reproduction of ranch life as heretofore existing and popularly known throughout the western states, and that said exhibition was then being daily visited by thousands of people who paid plaintiff an admission fee to see the same.'' The stipulation of the parties also states that plaintiff had erected ''The Arena'' and equipped the same at great cost for the purpose of furnishing suitable quarters for various kinds of exhibitions of a state-wide and national character, including ''educational and amusement exhibitions;'' that plaintiff paid an annual general property tax to the City of St. Louis and to the State of Missouri under the general taxing laws, and that plaintiff paid also an annual license tax of $150 to the City of St. Louis pursuant to the provisions of subdivision eighth of section 1383 of the Revised Code of said city; that the exhibition was operated and conducted in plaintiff's said building each day from the 5th to and including the 15th of December, 1929; and that no sum was paid for license fees other than the annual license tax of $150. The stipulation further states that the Arena, at the times mentioned, had a seating capacity of five thousand; and that, at the time the said exhibition was held, an advertisement was published

therefor in the daily newspapers, a copy of which was attached to the stipulation as Exhibit B.

Plaintiff alleged in its petition that section 1379 of the Revised Code of General Ordinances of 1926 of the City of St. Louis, which made it unlawful "to exercise within this city the business of . . . or to own, conduct, or manage for gain a theater or other exhibition, show, or amusement without a license therefor," and subsection seventh of section 1383 thereof did not apply to the exhibition then being conducted by plaintiff; that, if said sections of the ordinances did apply to such exhibition, they were unlawful oppressive, discriminatory, and confiscatory and contrary to the provisions of sections 3 and 4 of Article X and sections 4 and 30 of Article II of the Constitution of Missouri.

On December 6, 1929, while the exhibition at the Arena was in progress, the court issued an order to show cause why a temporary injunction should not be issued, and upon plaintiff's giving an injunction bond of $2,000, issued an order restraining defendants and each of them "from carrying out their threats to exact the sum of $150 per day of the plaintiff, or to in any manner molest, arrest or interfere with plaintiff's officers, employees and attendants in the management and conduct of its said business in the Arena," which order remained in effect until the court granted the permanent injunction.

Defendants contend that the exhibition at the Arena of the 101 Ranch Show was within paragraph seventh of section 1383 of the Revised Code of St. Louis of 1926, which imposes a license fee on every "circus, circus or menagerie, or menageries in which such entertainment is to be given." They point out that no eyewitness gave testimony as to the nature of the performances given, but that the parties giving the exhibition referred to it in the lease as a "circus" and also referred to the license necessary to conduct such exhibition as a "circus or exposition" permit. Defendants further point to the newspaper advertisement of the show (Exhibit B), where the word "circus" appears twice.

In opposition to defendants' contention, plaintiff asserts that the exhibition given did not come within said paragraph Seventh; that said paragraph, levying a license fee of $150 per day, is applicable to the type of performances commonly exhibited within tents and temporary enclosures but does not apply to "The 101 Ranch Show" produced in plaintiff's permanent building, the Arena, which was fully licensed as a place for holding exhibitions, shows, and amusements, under paragraph eighth of the ordinance in compliance with which plaintiff had paid the annual license fee of $150.

Defendants cite two cases to support their contention, the first of which is Professor Jacko v. The State, 22 Ala. 73, decided in 1853. We think that case is not applicable to the facts in the case at bar. The

opinion in that case states that the plaintiff in error admitted that he exhibited feats of "slight of hand" as charged in the indictment. The opinion therein also shows that the provision of the law prescribing an annual license, which Professor Jacko contended protected him from the necessity of taxing out a license for the "slight of hand" performances, was limited to "theatres."

In the case at bar, the annual license under which the Arena was operating was issued under paragraph eighth, which applied not only to theatres but also to "theatrical exhibitions, amusement or any other exhibition, show or amusement." Another point of difference between the Jacko case, *supra*, and the case at bar is that in the first-mentioned case it was admitted that Professor Jacko did exhibit feats of "slight of hands," whereas, in the case at bar it is not admitted that the performance at the Arena was a circus within the meaning of paragraph seventh of the ordinance.

The second case cited by defendants is Robertson et al. v. Heneger, 37 Tenn. (5 Sneed), 257, decided in 1857. In that case the license tax involved was assessed upon the "privilege" exercised by the plaintiffs therein of exhibiting a menagerie and circus of which they were the owners and managers. In that case, as in the Professor Jacko case, *supra*, the nature of the performance involved was not in dispute as it is in the case at bar. The only question in the Robertson case was whether or not the right to operate a circus or menagerie was a "privilege" within the meaning of the statute authorizing license taxes upon privileges.

The industry of able counsel on both sides has failed to disclose any decision of a court of this State in point on the questions involved herein, nor have we been able to find any such case in this State. The case which comes nearest, in our opinion, to being in point with the case at bar is State v. Cody (Tex. Civ. App.), 120 S. W. 267, cited by plaintiff. In that case the State and county sued to recover the sum of $750 license taxes from the famous "Buffalo Bill" for two separate performances of his Wild West Show, which license tax was authorized to be levied against "every circus wherein equestrian or acrobatic performances are exhibited." In the Cody case, as in the case at bar, the law did not define the word "circus." The court there held that the Legislature in enacting the law evidently intended that the word "circus" should be used in its common and ordinary acceptation, and that it should apply to the character of exhibition commonly known and understood as a circus. The court said it was doubtful that the Legislature had in mind an exhibition such as the "Wild West Show," the main features of which were intended to portray scenes, incidents, and characters peculiar to that period and to that region. The court then cited the rule that, when words employed in a law do not have a technical meaning or application and the law in which they are employed does not define them, they are

to be given their ordinary signification. In affirming the judgment in favor of the defendant "Buffalo Bill," the court said:

"It is true that the law should be so construed as to effectuate the legislative purpose as indicated by the language used, and in construing laws that impose burdens of taxation nothing should be left to inference or implication, and they should not by this method be held · to embrace and apply to subjects which are not expressly enumerated, either under some general heading or some particular mention." [State et al. v. Cody (Tex. Civ. App.), 120 S. W. 267, 269.]

In the case at bar it will be recalled that, in the stipulation upon which the cause was submitted to the trial court, the parties state "that at the time the petition in this cause was filed there was in progress and being conducted at said building, in accordance with the hereinafter mentioned contract, an exhibition known as 'The 101 Ranch,' a reproduction of ranch life as heretofore existing and popularly known throughout the western States . . ."

The lawmakers who enacted the ordinance involved herein did not define the word "circus," so we must take the word in its ordinarily accepted meaning. When we speak of a circus or menagerie, or both combined, we ordinarily have in mind performances given by traveling companies on vacant lots within tents, or some other kind of temporary enclosure, wherein trained lions, tigers, elephants, horses, dogs, and other animals, and frequently seals, are made to perform under the whip or command of a ringmaster or trainer. American boys and girls, as well as grownups, think of a circus and menagerie in terms of the never to be forgotten steam calliope playing the popular tunes of the day; also the beautiful ladies in spangles and tights, doing their graceful but hazardous bareback riding; the "marvelous" trapeze performers, and other aerial artists and artistes doing their "stunts" up at the topmost point of the main tent; the highly trained men and· women acrobats, known to the average small boy as "tumblers" and last, but not least, the clowns, those time-honored "knights of the sawdust ring," to make the grownups as well as the children laugh. A circus without clowns is no circus at all, according to the traditions of American life in large cities. Then there is the inevitable "side show" with the "freaks" of humanity from all parts of the earth, as well as freaks and strange animals of the jungle.

There is no evidence whatsoever to show that the exhibition involved herein contained the features commonly understood to make up a "circus" or "menagerie" except the reference to "circus" in the advertisement and the lease. However, such a reference to "circus" by the parties cannot have the effect of imposing liability for the extra license fee if in fact the exhibition was such that it did not come within the seventh paragraph of the ordinance. Plaintiff and the 101 Ranch Show could no more lawfully impose liability for the extra tax by what they said about their exhibition than they could in that

manner escape liability therefor if, under all the facts, paragraph seventh applied. After all, the intention of the lawmakers, as evidenced by the ordinance which they enacted, must govern.

A real circus in a tent, or other temporary enclosure, in a large city brings with it unusual hazards requiring extra precautions to be taken by municipal authorities in the way of police and fire protection for the public. Such elements afford a just and proper basis for the levying of license fees in larger amounts than those levied against theatres and other places of entertainment and amusement housed in permanent buildings where greater protection to the public against unusual hazards can be and is afforded.

In view of the commonly accepted meaning of the word "circus" and the absence of a definition thereof in the seventh paragraph of the ordinance involved in the case at bar, we do not believe it can reasonably be said to have been the intention of the lawmakers to require a license fee of $150 per day to be paid for the exhibition of the "101 Ranch Show" in the permanent structure, The Arena, in addition to the $150 annual license fee conceded to have been paid by plaintiff, as well as its regular general property taxes.

In Hale v. State, 217 Ala. 403, 116 So. 369, 372, the right of the lawmakers to impose a smaller rate of license fee upon theatres and other amusement places housed in permanent structures than the rate of fee charged against amusements or shows given in tents or other temporary structures was recognized and enforced. In that case the court said:

"It may be said, however, that there is a well-founded distinction between a transient and fugitive entertainment, and that permitted, domiciled in a prescribed location, subject to the supervision of municipalities. Under the police power, the place of exhibition in the municipality was important . . ."

In Park v. Morgan, 64 Fla. 414, 60 So. 347, a city's license tax provisions prescribed a rate of $12.50 per year for performances held in theatres, and a tax of $25 per day for theatrical shows given within sheds or temporary enclosures. The court, answering the contention that such laws discriminated unjustly and unconstitutionally between classes of shows, said:

"It may be that shows and performances of the latter kind (those in temporary enclosures) require more and stricter police regulation; that they invite a different class of people to congregate; and that the moral and intellectual influence of such performances are not on a plane with more permanent ones conducted in a regularly constructed theatrical building. The question of fire protection may also have had influence." [Park v. Morgan, 64 Fla. 414, 60 So. 347, 348.]

In Taxing District v. Emerson, 72 Tenn. 312, it was held that a license "upon the privilege of keeping a theatre or opera house or concert hall where theatrical entertainments are given," includes

entertainments given by companies hired by the proprietor or lessee, and that such companies are not liable to an additional tax. In that case the court said the question to be determined was whether the license to keep a theatre, opera house, or concert hall where theatrical entertainments are given, covered also and included necessarily the act of the parties employed by the owners of the theatre to give such entertainments. The court pointed out that a licensed theatre, concert hall or opera house would be an idle institution unless performances could be had in them; and that performances required trained performers who must either be the licensees themselves or others employed by them. The court there said:

"We think the license includes and protects the employees of managers who furnished the entertainments, and the minstrel troupe is but an essential agency in carrying on the business licensed." [Taxing District v. Emerson, 72 Tenn. 312, 314.]

The general rule with respect to the imposition of license fees is stated in 62 C. J. 852, as follows:

"Ordinances imposing license fees, being in derogation of the common law, are to be strictly construed in favor or the person against whom they are sought to be applied."

In 17 R. C. L. 475, the rule of construction of license laws is stated as follows:

"In construing a license tax law courts regard the substance and purpose of the ordinance rather than its form and language, and where doubt exists as to the meaning and scope of language imposing any tax, such doubt is to be resolved in favor of the taxpayer."

Our Supreme Court, in a comparatively recent case, upheld the validity of an ordinance imposing a license tax upon the sale of gasoline, but held that such provision created an exception to the provisions of the general ordinance levying license taxes on merchants, and also held that both ordinances should not be enforced. [Automobile Gasoline Co. v. City of St. Louis, 326 Mo. 435, 32 S. W. (2d) 281, citing Bassen v. Monckton, 308 Mo. 641, 649, 274 S. W. 404, 407.] In that case the city officials contended that the special ordinance imposing the tax upon the sale of gasoline was intended to supersede the license tax provided for in the general ordinance. The court upheld the contention of the city officials, and said that the courts would not give a statute or ordinance a construction which render it unconstitutional, absurd or unreasonable when it is susceptible of a constitutional or reasonable one; that it would not give a construction which would make it an instrument by which to work an injustice. The court also said: "Double taxation is not favored, and an intent to levy it should not be presumed." [Automobile Gasoline Co. v. City of St. Louis, 326 Mo. 435, 443, 32 S. W. (2d) 281, 283.]

From a consideration of the whole record, we are of the opinion that the provisions of paragraph seventh of the ordinance in question

were not applicable to the exhibition given at the Arena on the dates mentioned; that such performances were not subject to the tax provided for in said paragraph but were covered by the taxes levied and collected under the provisions of paragraph eighth of said ordinance.

The action of the circuit court in issuing a permanent injunction against the enforcement of paragraph seventh of the ordinance under the facts of this case was correct. The judgment of the circuit court is therefore affirmed. *Becker, J.,* concurs; *Hughes, P. J.,* not sitting because not a member of the court when the case was submitted.