# No. 18,699.

## THE CITY AND COUNTY OF DENVER, ET AL. *v.*
## DENVER BUICK, INC., ET AL.
(347 P. [2d] 919)

Decided December 5, 1959. Rehearing denied January 11, 1960.

Mr. John C. Banks, Mr. Earl T. Thrasher, Mr. Hans W. Johnson, for plaintiffs in error.

Mr. THEODORE EPSTEIN, Messrs. CREAMER & CREAMER, for defendants in error Denver Buick, Inc., Salco Corporation, Mollie Cohan and Lou Cohan.

Mr. DAYTON DENIOUS, Mr. OMER GRIFFIN, for defendants in error Weaver-Beatty Motor Company and Roy J. Weaver.

Messrs. GRANT, SHAFROTH & TOLL, Mr. HENRY W. TOLL, for defendant in error Rainbo Bread Company.

*En Banc.*

MR. JUSTICE MOORE delivered the opinion of the Court.

THIS cause is here on writ of error to review a judgment of the district court of the City and County of Denver entered in an action there filed to test the validity of certain portions of the zoning ordinance of the city.

Plaintiffs in error were defendants, and the Denver Buick, Inc., Mollie Cohan, Lou Cohan, and Salco Corporation were plaintiffs, in the trial court. Rainbo Bread Company, Weaver-Beatty Motor Company and Roy J. Weaver were permitted to intervene as additional parties plaintiff. In this opinion we will refer to defendants in error as plaintiffs or interveners or by their individual names, and plaintiffs in error will be referred to as defendants or by name. All parties plaintiff attacked the validity of Ordinance No. 392, Series of 1956, adopted by the City and County of Denver. They prayed for a judgment, declaring their rights thereunder, and for a decree restraining defendants from enforcing the ordinance.

Defendants filed a motion to dismiss the action on the ground that the complaints of plaintiffs and interveners failed to state a claim upon which relief could be granted. This motion was overruled. Defendants thereupon filed

an answer and the cause was tried to the court without the intervention of a jury.

Although the complaint of plaintiffs, which was adopted by interveners, contained seventeen different claims for relief, the trial court, with the consent of counsel for the parties, grouped all of said claims, except the fifteenth, under five main issues, as follows:

"(1) Is the ordinance unconstitutional because of its title under the Charter?

"(2) Was the ordinance passed in conformity with the Charter concerning notice to the property owners?

"(3) Was a public hearing held as contemplated under the Charter?

"(4) If the ordinance was passed as provided by the Charter, is that portion of the ordinance which restricts the owners of the district which is designated C on Defendants' Exhibit No. 6 unconstitutional for any of the reasons set forth in the plaintiffs' or interveners' complaint?

"(5) Is the answer of the defendant City and County pertaining to the affirmative defense of resorting to administrative remedies a good defense?"

The fifteenth claim of plaintiffs, relating to nonconforming uses, was considered apart from the issues above stated.

Under the questioned ordinance as originally adopted all the property involved herein was located in a district classified as B-4. This classification was changed to B-6 by an amendment as appears from the first affirmative defense contained in the answer of defendants, as follows:

"On December 29, 1956, pursuant to Ordinance No. 451, Series of 1956, that land and that property alleged by plaintiffs to be theirs was classified, among other lands, as a B-6 District under the Zoning Ordinance of the City and County of Denver and was made subject to the restrictions and regulations established for that district by Ordinance No. 450, Series of 1956, effective

December 29, 1956 (a copy of which Ordinance No. 450, marked Exhibit 'A' is attached hereto and by such reference is made a part hereof.)"

Plaintiffs answered the above allegations in the following language:

"7. That the said B-6 Classification is meaningless, arbitrary, capricious, and void, and is an endeavor to circumvent the clearly discriminatory and abusive provisions of the B-4 District, while conferring none of the benefits of the B-5 District, all directly in violation of the rights of the Plaintiffs as set forth in their Ninth through Seventeenth Claims for Relief, each of which is incorporated herein and made specifically a part hereof, with specific reference to the said purported ordinances 450 and 451."

A second affirmative defense contained in the answer of defendants alleges in substance that all the ordinances under attack provide for administrative relief from the provisions thereof, and that plaintiffs have not availed themselves of these remedies. Plaintiffs allege that these allegations state no defense for the reason that the ordinance is unconstitutional and void.

April 4, 1958, the trial court entered its findings and judgment. That portion of the decree to which defendants object and which is now before us for review reads as follows:

"WHEREFORE, IT IS ORDERED, ADJUDGED AND DECREED:

"1. That the B-6 District is a part in law and use of the B-5 District, and subject to the same regulations.

"2. That Article 614 of Ordinance 392 of the Series of 1956 as it relates to the so-called B-6 District requiring off-street parking violates the City Charter and particularly Chapter 219 B, in that the regulations are not uniform.

"3. That Article 614 of Ordinance 392, Series of 1956, is unconstitutional and violates Article II, Section 15,

and Article II, Section 25 of the Colorado State Constitution.

"4. That Article 614 of Ordinance 392, Series of 1956, is unconstitutional in that it is oppressive, discriminatory and an invasion of the plaintiffs' and interveners' rights to use of their property.

"5. That off-street parking is a public and municipal function, and a property owner's property cannot be taken for a public use without just compensation.

"6. That the properties of the plaintiffs and interveners are subject to the regulations pertaining to the so-called B-5 District and none other.

"7. That Councilman's Bill 403, Ordinance 392, Series of 1956, repeals Ordinance 14, Series of 1925.

"8. That the operation of an apartment by the plaintiff Salco Corporation is a conforming use under the Ordinance."

Questions to be Determined.

First: *Where a zoning ordinance of a municipality contains provisions which purport to require the installation of off-street parking facilities by the owner of land as a condition which must be fulfilled before such owner will be permitted to make use of his land for business purposes authorized in the district within which the land is located; are such provisions unconstitutional when tested by the due process clause of the state and federal constitutions and by Article II, Section 15, of the State Constitution which provides, inter alia, that "private property shall not be taken or damaged, for public or private use, without just compensation"?*

We answer this question in the affirmative, and hold that such provisions are repugnant to each of said constitutional guarantees. We think it essential to again state some basic principles of constitutional law to which we are indebted as a nation of freedom loving people, and to which we must steadfastly adhere if individual freedoms and liberties are to survive.

In *City and County of Denver v. Thrailkill*, 125

Colo. 488, 244 P. (2d) 1074, this court held that the restraint upon the freedom of one who provides transportation for hire to make use of public streets was "completely out of harmony with the American constitutional concept of fundamental freedoms and liberties, under which the individual has the right to engage in a lawful business which is harmless in itself and useful to the community, unhampered by unreasonable and arbitrary governmental interference or regulation." Without reservation we are firm in our adherence to the principle that "the privilege of a citizen to use his property according to his will is not only a liberty but a property right, subject only to such restraints as the common welfare may require." *People v. Norvell,* 368 Ill. 325, 13 N.E. (2d) 960. If a restriction upon the use of property is to be upheld as a valid exercise of the police power it must bear, "a fair relation to the public health, safety, morals, or welfare," and have "a definite tendency to promote or protect the same." In determining the validity of restraints upon freedom imposed by statute or ordinance, "The determination we are called upon to make is whether the ordinance has a *real and substantial* relation to the accomplishment of those objectives which form the basis of police regulation." *Denver v. Thrailkill,* supra. (Emphasis supplied.) *Bohn v. Board of Adjustment of Denver,* 129 Colo. 539, 271 P. (2d) 1051.

In *Buchanan v. Warley,* 245 U. S. 60, 38 Sup. Ct. Rep. 16, the Supreme Court of the United States asserted that:

"Property is more than the mere thing which a person owns. It is elemental that it includes the right to acquire, use, and dispose of it. The constitution protects *these essential attributes* of property." (Italics ours.)

As forcefully stated by the former Chief Justice of the Supreme Court of the United States, Charles Evans Hughes, at ceremonies commemorating the establishment of a government of *free* people:

"We protect the fundamental right of minorities in

order to save democratic government from destroying itself by the excesses of its own power. The firmest ground for confidence in the future is *that more than ever we realize* that, while democracy must have its organization and controls, *its vital breath is individual liberty.*" (Emphasis supplied.)

It is the unquestioned duty and responsibility of the judicial branch of government, through the decision of controversies which come before it, to safeguard and maintain the constitutional provisions which guarantee the maximum free and unrestricted use of property by the citizen, and to strike down those enactments which unreasonably and unnecessarily fasten upon him new restraints upon freedom of action in the use and enjoyment thereof.

Any legislative action which takes away any of the essential attributes of property, or imposes unreasonable restrictions thereon, violates the due process clause of the Constitutions of the United States and the State of Colorado. In *Bettey v. City of Sidney,* 79 Mont. 314, 257 Pac. 1007, we find the following most significant language:

"The constitutional guaranty that no person shall be deprived of his property without due process of law may be violated without the physical taking of property for public or private use. Property may be destroyed, or its value may be annihilated; it is owned and kept for some useful purpose and it has no value unless it can be used. Its capability for enjoyment and adaptability to some use are essential characteristics and attributes without which property cannot be conceived; and hence any law which destroys it or its value, or takes away any of its essential attributes, deprives the owner of his property."

In *Chicago B. & Q. Ry. Co. v. Illinois, et al.,* 200 U. S. 561, 26 Sup. Ct. Rep. 341, we find the following:

"The constitutional requirement of due process of law, which embraces compensation for private property taken for public use, applies in every case of the exertion of

governmental power. If, in the execution of any power, *no matter what it is,* the government, Federal or State, finds it necessary to take private property for public use, it must obey the constitutional injunction to make or secure just compensation to the owner." (Emphasis supplied.)

 At the common law the owner of property has a vested right to make the fullest legitimate use of such property. It follows, therefore, that express legislative prohibition within the perimeter of constitutional permission is necessary in order to place restrictions upon the legitimate use of property. The ordinance here in question, purporting to command a specific use of property as a condition precedent to the right to do business, is in derogation of the common law and *must be strictly construed in favor of the person against whom its provisions are sought to be applied. Denver v. Thrailkill,* supra; *Hart v. Board of Examiners,* 129 Conn. 128, 26 Atl. (2d) 780; *National Exhibition Co. v. City of St. Louis,* 235 Mo. App. 485, 136 S.W. (2d) 396.

This court has been careful to protect constitutional rights in construing the zoning ordinance of 1925, the provisions of which were far less drastic than those now before us. With reference to the 1925 Act this court said:

"In broad outline, but only so, we have held the zoning ordinance invoked by the building inspector to be constitutional." *Hedgcock v. People, ex rel. Arden Realty and Investment Company,* 98 Colo. 522, 57 P. (2d) 891.

In *Colby, et al. v. Board of Adjustment of Denver, et al.,* 81 Colo. 344, 255 Pac. 443, "in broad outline" the old ordinance was held constitutional but this court there said:

"This decision is not to be construed as passing upon or approving each and every provision of the Denver zoning ordinance, nor as fixing its application to every circumstance that may arise."

In numerous instances this court has held that even

the old, less drastic zoning ordinance operated to deny constitutional rights to persons adversely affected by its terms. *People ex rel. Friedman v. Webber, Building Inspector,* 110 Colo. 161, 132 P. (2d) 183, and cases there cited.

Section 614 of the Zoning Ordinance here in question deals with the subject of off-street parking as related to the several district classifications. In so far as District B-5 (the main down town area) is concerned, it is provided that "Off Street Parking Requirements shall be of no force and effect in this district." But in District B-6 in which the property here involved is located, the ordinance classifies the off-street parking requirements into eight different trade categories, with different parking requirements for each. The utter unreasonableness of these off-street parking requirements is made crystal clear by a letter, introduced in evidence, which was written by defendant to the plaintiff Lou Cohan. The latter had applied for a building permit, which was denied. During the course of his frustrated effort to put his property to use in lawful business enterprises, he received the following letter in explanation of the denial of his application to build:

"Plans submitted do not indicate the specific amount of floor area to be assigned to each of several classes of use. Nor is there indicated the precise area intended to be devoted to off-street parking. Our engineer, applying various techniques for estimating, has estimated that automobile sales (Parking Class 6) would occupy 3,000 square feet and thus require 1500 square feet of off-street parking; that office uses (Parking Class 2) would occupy 106,000 square feet, requiring 53,000 square feet of off-street parking; and that a restaurant (Parking Class 4) would occupy 5000 square feet, requiring 15,000 square feet of off-street parking — for a total of 69,500 square feet of off-street parking. Attachment A of your application for construction permit indicates that 'a substantial portion' of approximately 37,000 square feet of

basement and sub-basement area would be used for parking purposes. From this it is evident that the off-street parking proposed to be provided does not meet the requirements of Article 614. Again, additional information would be required to determine the exact amount of the proposed excess."

With reference to parking provisions of the ordinance the learned trial judge stated in his decree that:

" * * * the off-street parking requirements in the B-6 District are confiscatory, oppressive, discriminatory, unreasonable and unconstitutional, and to enforce the provisions thereof would deprive the plaintiffs and intervenors of their property without due process of law."

With this statement we agree.

In *Bohn v. Board of Adjustment of Denver*, 129 Colo. 539, 271 P. (2d) 1051, this court said:

"It is a fundamental principle recognized by all the authorities that any regulation or restriction upon the use of property which bears no relation to public safety, health, morals or general welfare, cannot be sustained as a proper exercise of the police power of the municipality."

The legal effect of the argument of the City is that it has a problem of concentration of traffic in the streets and that accordingly there is a right, under the zoning ordinance, to appropriate for off-street parking substantial portions of property of citizens desiring to use that property for a legitimate purpose, and to prohibit the use of that property for any purpose until its owners devote a substantial portion thereof to parking; and this despite the fact that in District B-5 which is in all respects similar to B-6 in general usage, no such requirement exists! No such power exists in the city thus to take private property for a public purpose without compensation to the owner for the taking. It would be quite as proper to argue that the city had the right, under the guise of "zoning" to require dedication of private property for the street itself, if it were considered that a

given street was generally inadequate to carry the traffic; and to prohibit the use of property for any legitimate purpose until such dedication was made. If it be true that a traffic problem exists, it cannot be legally solved by confiscation of private property without compensation, under a pretense of "zoning."

██ The alert business man as a matter of voluntary action fully realizes the advantages which are to be gained by affording parking facilities to his customers. However, he cannot be compelled to do so under penalty of forfeiting the right to make a beneficial use of his property. The city has ample power to control the "congestion of traffic" by adoption of regulations adequate for the purpose, which are directly related to that problem. Compulsory, involuntary off-street parking maintained at the expense of a property owner as a price tag or tribute for the exercise of the constitutional right to do business, is "completely out of harmony with the American constitutional concept of fundamental freedoms and liberties." It has no definite or substantial tendency to promote or protect those objectives which form the basis of police power.

We direct attention to the opinion of this court in *Willison v. Cooke,* 54 Colo. 320, 130 Pac. 828, from which we quote:

"One of the essential elements of property is the right to its unrestricted use and enjoyment; and as we have seen, that use cannot be interfered with beyond what is necessary to provide for the welfare and general security of the public. Enforcing the provisions of the ordinances in question does not deprive the petitioner of title to his lots. He would not be ousted of possession. He would still have the power to dispose of them; but, although there would be no actual or physical invasion of his possession, he would be deprived of the right to put them to a legitimate use, which does not injure the public, and this, without compensation or any provision therefor. This would clearly deprive him of his property

without compensation, and without due process of law, which our federal and state constitutions not only inhibit, but which would be repugnant to justice, independent of constitutional provisions on the subject."

In *Hedgcock, Building Inspector v. People ex rel. Reed,* 91 Colo. 155, 13 P. (2d) 264, this court recognized that where "public health and safety will be best conserved" reasonable restrictions may be imposed upon the use of property. However in that case we find the following apt language, " * * * but not less fundamental is the *inherent right of the owner [of property] to erect buildings covering such portions thereof as he may elect,* and put his property to any legitimate use." (Emphasis supplied.)

And finally upon this question we direct attention to pertinent language of Mr. Justice Holmes in *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.C. 158, 67 L. Ed. 322:

"The protection of private property in the Fifth Amendment presupposes that it is wanted for public use, but provides that it shall not be taken for such use without compensation. * * *

"The general rule at least is, that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking. * * * We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change."

See also *Arverne Bay Const. Co. v. Thatcher,* 278 N.Y. 222, 15 N.E. (2d) 587.

Second. *Where a zoning ordinance purports to restrict the use of property in a district which has flourished as a business and commercial district for more than fifty years; where such ordinance imposes onerous and unreasonable conditions and terms under which pre-existing lawful uses of property may be continued as nonconforming uses, and describes numerous events and means*

*by which the former lawful use may be terminated; will such provision be upheld as a valid exercise of the police power of a municipality?*

 This question is answered in the negative. The ordinance in question forbids the building of any further or additional apartment houses in the B-6 District wherein is located the property of the plaintiffs and the intervenors. It defines the apartment house situated on the property of some of the plaintiffs as a nonconforming use, and declares the same no longer a "use by right." It then provides that the owner "shall register such nonconforming use by filing with the Department of Zoning Administration a Registration Statement for such nonconforming use, and this statement:

. " * * * May be in such form and require the furnishing of such information and representations as deemed appropriate by the Department. * * *

" * * * and a copy of each original Registration Statement, or such other statement giving notice thereof as the Department shall deem appropriate, shall be recorded by the Department in the office of the Clerk and Recorder."

Annually thereafter the department may require the filing of a questionnaire inquiring as to the operation, status and other details concerning the nonconforming use. If not returned completed within ninety days from date of mailing, the Department shall record in the office of the Clerk and Recorder a notice that the applicable nonconforming use is presumed to have been abandoned; that if thereafter it shall be established to the satisfaction of the Department that said use has not been abandoned, the Department shall record with the Clerk and Recorder a certificate withdrawing the notice. For other reasons the right to continue the uses of the property of plaintiffs and others similarly situated is in constant jeopardy, for the ordinance further provides a number of occurrences whereby such nonconforming use shall

be terminated, many of which may occur through no fault of the owner.

The ordinance provides that the nonconforming use shall be terminated by any one or more of the following:

"Sec. 617. 1-4 (1)

"By Abandonment. Abandonment of nonconforming use shall terminate immediately the right to operate such use.

"Sec. 617. 1-4 (2)

"By Violation of Ordinance:

"Any one of the following violations of the ordinance shall terminate immediately the right to operate a nonconforming use:

"(a) Changing a nonconforming use to another nonconforming use except as herein provided and authorized;

"(b) Failure to make, within the period herein provided, a nonconforming use comply with the Limitations on External Effects of Uses as established by this ordinance or subsequent amendment hereof;

"(c) Increasing either or both the land area or the floor areas occupied by a nonconforming use without the approval of the Board of Adjustment for such increase.

"Sec. 617. 1-4 (3)

"By Specific Acts of Termination.

"Any one of the following Specific Acts of Termination shall terminate immediately the right to operate a nonconforming use; (Two of these provisions are omitted here as nongermane to our problem)

"(c) Non-operation of a nonconforming use for a period of twelve or more successive calendar months;

"(d) Vacancy for a period of twelve or more successive calendar months of the structure or that part of a structure occupied by the nonconforming use. (Five year provision eliminated as not germane to the case at bar.) (Three year provision eliminated as not pertaining to the case at bar.)

"Sec. 617. 1-4 (5)

"By Destruction, Damage or Obsolescence of Structure:

"The right to operate and maintain any nonconforming use shall terminate and shall cease to exist whenever the structure or structures in which the nonconforming use is operated and maintained:

"(a) Is damaged or destroyed, from any cause whatsoever, and the cost of repairing such damage or destruction exceeds fifty per cent of the replacement cost of such structure on the date of such damage or destruction.

"(b) Becomes obsolete or sub-standard under any applicable ordinance of the municipality and the cost of placing such structure in lawful compliance with the applicable ordinance exceeds fifty per cent of the replacement cost of such structure on the date that the proper officials of the municipality determine such structure is obsolete or substandard."

In the first place, the charter of the City and County of Denver, which was amended in 1923 to include therein Sec. 219-A authorizing the city council to pass zoning laws, confers none of the powers upon the city council which it purported to exercise with relation to nonconforming uses as set forth in section 617-1 of the ordinance. The charter provision, which certainly defines the limits of the council's authority within that area not controlled by constitutional provision, reads as follows:

"Section 1. Grant of Power. For the purpose of promoting health, safety, morals or the general welfare of the community, the Council of the City and County of Denver is hereby empowered to regulate and restrict the height, number of stories and size of buildings and other structures, the percentage of lot that may be occupied, the size of yards, courts and other open spaces, the density of population and the location and use of buildings, structures and land for trade, industry, residence, or other purposes.

"Section 2. Districts. For any or all of said purposes,

the Council may divide the City and County of Denver into districts of such manner, shape and area as may be deemed best suited to carry out the purposes of this Amendment; and within such districts it may regulate and restrict the erection, construction, reconstruction, alteration, repair or use of buildings, structures or land. All such regulations shall be uniform for each class or kind of buildings throughout each district, but the regulations in one district may differ from those in other districts.

"Section 3. Purposes in View. Such regulations shall be made in accordance with a comprehensive plan and designed to lessen congestion in the streets; to secure safety from fire, panic and other dangers; to promote health and the general welfare; to provide adequate light and air; to prevent overcrowding of land; to avoid undue concentration of population; to facilitate the adequate provisions of transportation, water, sewerage, schools, parks and other public requirements. Such regulation shall be made with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout the City and County of Denver."

Section 617 and the subdivisions thereof attempt to legislate many things not within the purview of the language of the enabling amendment to the charter. Certainly the people have never expressed any intention by implication or otherwise that the City Council should have power to impose the drastic regulations upon owners of property theretofore used for lawful purposes, requiring them to make reports, to submit to annual questionnaires, to record certificates which garble and confuse their titles to real estate, to lose their rights to lawfully use real estate by short time vacancies or short time presumptive abandonment, or to lose such rights by reason of unfortunate disasters such as fire, wind,

insurrection or inability to procure tenants for a period of one year, etc., all without regard to depressions, panics or other unforeseen causes over which the property owner has no control. Nor did the people of Denver in said charter amendment ever say by implication or otherwise that the City of Denver through its council could take unto themselves authority to arbitrarily regulate or prohibit minor alterations of structures or use of space which the owner might from time to time find proper or necessary to augment his income therefrom, or to make the same more comfortable or adaptable for the use of his tenants. All the authorities hereinabove cited are equally applicable to the instant question.

Third. *Are the various provisions and restrictions set forth in Ordinance No. 392 Series of 1956 unlawfully and unreasonably discriminatory in that they impose certain obligations and restrictions upon the property in the B-6 District so as to work undue hardships within that District while favoring the B-5 District by not imposing those restrictions and obligations upon the property within the B-5 District, and thus creating a condition of subserviency by one district in favor of the other?*

█ This question is answered in the affirmative. The trial court determined from knowledge common to any citizen, and from the language of the ordinance itself, that there is no appreciable or apparent difference in the characteristics of District B-6 and B-5 except that in the latter the uses authorized include operation of a pawnshop or music studio, while these privileges are denied in the B-6 District. Indeed, a reading of Sections 612.9-1 and 612-10 respectively lead to no other conclusion. With reference to the B-6 District the ordinance reads:

"This district, at present, is a large area located immediately adjacent to the B-5 District, for which it acts as a service area * * *."

We know of nothing which justifies any such conclusion. The trial court took notice that within the District

B-6 are a great many buildings and business enterprises which serve the entire city of Denver, the state, and large districts outside the state.

The regulations of the ordinance as to B-5 do not require off-street parking, but in the B-6 District the ordinance demands off-street parking facilities and sets up a maze of oppressive rules and regulations pertaining thereto. None of these requirements are made as to the B-5 District. Gross floor area provisions are set up in the B-6 District, none of which appears in the B-5 District. The city regulates private property in the B-6 District so as to require off-street parking based on nature and type of the trade or business, use of the building, size of the building to be erected, number of employees in excess of five, the religious belief of employees, the grade in school of children, furnishing services to the B-5 District, protecting an adjoining residential district, and serving as a shopping center for the adjoining residential districts; while no such regulations are required in the adjoining B-5 District although all types of business and buildings permitted are the same in both districts, with the two exceptions above noted.

This is not to say, however, that the trial court was correct in that part of its decision wherein it finds that the property in the B-6 District is subject to the ordinance as set forth in the B-5 District. Such a result involves a legislative function beyond the power of the court, and we must overrule the judgment of the trial court in so far as it purports to place property in the B-6 District into that classified B-5.

Fourth. *Where a zoning ordinance is adopted by a city council and becomes a law on a given date; will a provision thereof purporting to fix the effective date of the ordinance as of a time prior to its adoption be upheld?*

The answer to this question is "No." In the instant case the ordinance in question was enacted and became law on November 7, 1956. A provision therein purported to relate back the effective date of the ordi-

nance to February 11, 1955. It is sufficient to say that the Constitution of Colorado provides that no law "retrospective in its operation" shall be passed by the General Assembly. What the legislature cannot do at the state level in this connection, the city council cannot do in municipal affairs.

It follows that any person who applied for a building permit prior to November 7, 1956, was entitled to have his application considered under the only zoning law in force at that time, and that law was the zoning ordinance of 1925, as amended.

Judgment of the trial court is affirmed in all respects except as to that part of the same which declares the property in the B-6 District to be subject to the ordinance as it pertains to the B-5 District.

Mr. Justice Frantz specially concurs.

Mr. Justice Sutton concurs in part and dissents in part.

Mr. Justice Day and Mr. Justice Doyle dissent.

Mr. Justice Frantz specially concurring:

I believe in the rightness of the opinion of Mr. Justice Moore, and further believe that some aspects of his opinion can bear amplification.

Justification of this zoning ordinance in the name of progress, and on the theory that the Constitutions, Federal and state, are flexible enough to sustain it, is not in my opinion warranted. All too frequently acceptance of legislation is urged because it represents progress, and because the flexibility of both Constitutions allegedly has come to mean documents of boundless accommodation, Protean in their adjustments. Beguiling indeed are these notions, and hence their advancement as arguments for a proposition should be scrutinized and analyzed with care.

Let us examine and evaluate aspects of the ordinance in question. Is there sanction in the law for the provision regarding off-street parking? — for the provision placing technical demands upon one who desires to keep alive a nonconforming use? — for the provision giving the ordinance a retrospective operation?

Answers to these questions begin with certain fundamental, immemorial rules of property law. In ignoring or overlooking these basic tenets the law has been reduced to a state of contrarieties, where ownership envisions *rights* in the law of property, but only *privileges* in the law of zoning and city planning. It is imperative that we return to basic concepts, for then we can get direction and proceed correctly toward our goal — the amelioration of municipal ills.

What derives from the ownership of property? The ordinance under attack here is typical of one answer to the question. In so far as zoning applies, the owner has an inchoate, limited right to put his property to a use; he must go to an agency for a permit to develop his property in a certain way. The zoners and city planners have devised laws by which the owner must seek and obtain a license to do some particular thing with his property. Through these laws certain rights in property are placed under lock and key, and in their place arises a privilege to improve one's property, granted only after application and then only as the law permits.

Today a zoning board issues a permit to the owner to put his property to a certain use. This board exercises a legislatively imposed discretion in passing upon the application for the permit. And this permit bestows a privilege upon the owner. Such permit "partakes of a personal privilege and grant which attaches to the land. The right in so far as it is a personal privilege is not assignable, and it must be exercised within a reasonable time after its issuance." *Hanley v. Cook,* 245 Mass. 563, 139 N.E. 654. See Rhyne, Municipal Law, page 893.

There is another answer to the question of what de-

rives from ownership. It has been tested in the crucible of time, and by reason of its merit constitutional provisions were conceived and cast in its mold. By it an owner has more than a conferable privilege to use his property. He has a legal right, subject to certain restraints, to enjoy and use his property; his ownership, and his enjoyment and use springing therefrom, are not privileges, but are rights which this government was instituted to protect.

If this be not true, of what avail is it that "All persons have certain natural, essential and inalienable rights, among which may be reckoned the right * * * of acquiring, possessing and protecting property . . .," covenanted in Article II, Section 3, of our Constitution? Of what avail that "Private property shall not be taken or damaged, for public or private use without just compensation," assured in Article II, Section 15? Of what avail that "No person shall be deprived of life, liberty or property, without due process of law," solemnly pledged in Article II, Section 25? Of what avail that a state may not "deprive any person of life, liberty or property without due process of law," guaranteed in Amendment XIV, Section 1, of the Federal Constitution?

Property had a well-defined meaning at the time these Constitutions were adopted. "The natural right one may have to use his own property as he wills is subject always to the limitation that in its use others shall not be injured. That which is hurtful to the comfort, safety, and welfare of society may always be prohibited under the inherent or plenary power of the state, notwithstanding the incidental inconvenience or loss individuals may suffer thereby. This power is the law of necessity, and is founded upon the maxim, 'Salus populi suprema lex.' The exercise of the power is essential to the maintenance of society, and the establishment of government itself presupposes the surrender to it by the individual citizen of the right to regulate, and even forbid, such use of his private property as would prove injurious to the

citizens generally. *City of Chicago v. Rogers Park Water Co.,* 214 Ill. 312 [73 N.E. 375]; *Mugler v. Kansas,* 123 U.S. 623, 665 [8 Sup. Ct. 273, 31 L. Ed. 205]. *It is equally true, however, that the owner of property has the right to put it to any use he desires, provided in so doing he does not imperil or threaten harm to others. Legislative restrictions* of the use of property are imposed only upon the theory of necessity; that is, they *are necessary for the safety, health, comfort, or general welfare of the public." Curran Bill Posting & Distributing Co. v. Denver,* 47 Colo. 221, 107 Pac. 261, 27 L.R.A.N.S. 544. (Emphasis supplied.) Cf. *Mooney v. Village of Orchard Lake,* 333 Mich. 389, 53 N.W. (2d) 308; *O'Connor v. Moscow,* 69 Ida. 37, 202 P. (2d) 401, 9 A.L.R. (2d) 1031 (both zoning cases). See *Colby v. Board of Adjustment,* 81 Colo. 344, 255 Pac. 443.

It has been said that "[i]f the right of use be denied, the value of the property is annihilated and ownership is rendered a barren right." *Spann v. Dallas,* 111 Tex. 350, 235 S.W. 513, 19 A.L.R. 1387; *O'Connor v. Moscow,* supra. Unless the contemplated use of property imperils the safety, health, comfort or general welfare of the community, it appears that a denial of such use would be invalid. And a zoning restriction must have a reasonable and substantial relation to the safety, health, morals or general welfare; the connection may not be tenuous, vague or remote. 101 C.J.S. §7, page 683 et seq. See *Hedgcock v. People,* 91 Colo. 155, 13 P. (2d) 264.

Is there such a relation to safety, health, morals or general welfare as warrants the provision in the ordinance for off-street parking? As in the numerous zoning ordinances of other cities requiring the installation of off-street parking facilities in order to make use of property, justification for the provision in question is urged on the ground that Denver has a traffic problem: certain streets in the industrial, commercial and business areas of the city are choked with moving and parked cars, and further uses of property will magnify the con-

dition. To the extent that contemplated uses magnify the condition, the ordinance is said to be proper and effectual in that it will constitute a holding-of-the-line against intensifying the problem.

Although courts generally cannot question the wisdom and policy of a zoning law, they have the duty to determine "that the power must not be exercised so arbitrarily or unreasonably as to make the [zoning] ordinance unconstitutional in its operation and effect," *Colby v. Board of Adjustment,* supra. If the effect of off-street parking facilities is to intensify the traffic condition, is ineffectual on examination, and putting it into operation would destroy the thing it purports to protect, clearly it would be unconstitutional. Property would then be taken in violation of cited constitutional provisions.

And that would be the very effect of the operation of the off-street parking provision. Parking space in these areas has reached flood-tide; moving and parked vehicles are jamming the streets; therefore, make possible more parking areas by requiring owners of buildings to provide off-street facilities, and thereby concentrate more moving traffic in the areas. Alleviate the lesser of two evils, the parked car, so that the greater, the moving vehicle, can be put in increased mass movement. A self-defeating condition inevitably follows such a development, for with more parking facilities available, more vehicles are attracted to the area, and traffic becomes denser.

If an owner builds a large structure on his land (and let us assume it is a useful building presenting no aspects of being a nuisance), does it imperil safety, health, morals or general welfare because no provision is made for parking facilities? It may be a building requiring, because of the nature of the business conducted therein, very few employees, and very few persons may be attracted to it for trade. On the other hand, it may house businesses having many employees and bringing to it many people. The building may be located on very busy

streets, heavily burdened with moving and parked ve-hicles. In either case, automotive traffic attracted to the building may be a minute part of one per cent or it may be one per cent of the total traffic on the streets around the structure on any or every day.

Continuing with our illustration: the total traffic represents 100%, and the problem of how to handle this total traffic is one of municipal concern. It is primarily a street problem; it involves movement of vehicles with dispatch, convenience and safety. Even the total parking may be an inconsequential percentage of the total traffic using the streets around the building. Other streets in the area may have substantially less traffic and less parking. In all these illustrations we are dealing with variants, all of which go to the question of the reason-ableness of the provision requiring the installation of parking facilities.

Is there a reasonable connection between traffic con-gestion and a large building to which may be attracted considerably less than one per cent of the parked and moving cars on the street? In most instances the street, its width, its accessibility to other important streets, the directness with which persons using it can reach points of interest or of business, and probably other factors create the problem of traffic congestion. As can be seen, in essence the problem begins in the street and ends there.

In fact, there is authority for the proposition that mounting traffic burdens or hazards are matters which constitute police problems and are not within the prov-ince of the zoning authorities. *Greenberg v. City of New Rochelle,* 129 N.Y.S. (2d) 691, affirmed 134 N.Y.S. (2d) 593, appeal dis. 308 N.Y. 736, 124 N.E. (2d) 716; *Prop-erty Owners Ass'n, etc. v. Board of Zoning Appeals,* 123 N.Y.S. (2d) 716.

Adelphi College, located in the village of Garden City, N. Y., made application to the Zoning Board for permis-sion to erect stands which would accommodate 3,958 per-

sons, and the Board approved stands for only 2,000 persons, subject to certain conditions. As stated by the Supreme Court of New York in *Property Owners Ass'n, etc. v. Board of Zoning Appeals,* supra: "The principal question raised upon the hearing related to a possible increase in traffic and parking upon the village streets which allegedly would be detrimental to the residents but the evidence does not justify a conclusion that the presence or absence of permanent seats would have that effect." In the syllabus is a succinct statement of the holding of the court, viz.: "Great increase in traffic and parking on village streets, if a college were granted permission to erect seating stands adjacent to its athletic field in village, were problems for police, not village zoning authorities."

This total traffic condition represents a municipal and public problem to be solved. Property dedicated to its solution is property devoted to a public use. Involuntary dedication of such property to such use is a taking of the property. Only a resort to sophistry may sustain the ordinance as not constituting the taking of property for a public use.

Indeed, there is argument that only persons going to a building will be permitted to use the parking facility provided for the building. It is argued that parking is furnished for their convenience, and therefore it is not requiring an owner to put his property to a public use. If that be true, then it is a taking for private use, a taking of more doubtful validity.

How far can a city go in requiring accessory uses? Could a city require an apartment house builder who intends to accept families with children to furnish classrooms for such children in order to ameliorate traffic congestion and related problems on the streets on which his building will be located? In order to keep children off the streets, whether such children are tenants or visitors of tenants, could the city require such builder to furnish playgrounds and a gymnasium — yes, and super-

visors to maintain safety and order while these facilities are being used? Could the city require the builder of an office building to construct over- or underpasses for tenants and their patrons where the building would be located on heavily traveled streets? Instances could be multiplied, but these questions test the measure of the proposed power of a city.

As a matter of fact, the illustrations suggested by the foregoing questions have a better basis for being held valid than the reality with which we are dealing, for in each of the illustrations the problem of safety has a closer relevance to the use of the property than the off-street parking provision has to the uses of property described in the instant ordinance.

The zoning ordinance in question details action that must be taken by an owner in order for him to preserve a nonconforming use. If through inadvertence, oversight, misunderstanding or other mishap the owner should fail to take some step in the process required, the nonconforming use is placed in automatic jeopardy. Thus, a very valuable property on which is conducted a very profitable business, all of which is inoffensive per se except that it does not conform to the uses permitted by the ordinance in the district, may, by reason of the failure to perform some condition required to save a nonconforming use, become subject to the drastic provisions of the zoning law.

The conditions of the ordinance for keeping alive nonconforming uses have no reasonable basis in the exercise of the police power, for they represent nothing more than artificial quicksands for the owner. They make it a facile task for the city to eliminate nonconforming uses. These conditions have for their aim the expectation that the owner housing a nonconforming use will be guilty of an omission which will place the city in a position to assume the offensive in bringing about the speedy and effective liquidation of the nonconforming use.

As has been pointed out previously in this opinion,

our constitutional provisions were drawn to protect the rights of ownership, use and enjoyment of property. That which the Constitution secures, the ordinance seeks to render insecure. Constitutional protection extends to the nonconforming use and to the property quartering such use under a zoning law.

It should not be the objective of a zoning ordinance to bring about the extinction of a nonconforming use through unreasonable and arbitrary law; rather it should be "the purpose and intent of the ordinance to protect the owner's right to a non-conforming use * * * " *State v. Hunt,* 235 Wis. 358, 291 N.W. 745. "The right to a non-conforming use is a property right and any provision of a statute or ordinance which takes away that right in an unreasonable manner, or in a manner not grounded on public welfare, is invalid." *Schneider v. Board of Appeals,* 402 Ill. 536, 84 N.E. (2d) 428.

Perhaps the leading case on the reasonableness of an ordinance devising a way to bring about the cessation of a nonconforming use is *O'Connor v. Moscow,* supra. The law for accomplishing the purpose cannot be arbitrary or unreasonable, and this rule and its application is well depicted in this decision. The ordinance in that case ordained it would be unlawful to open and operate a new or additional business in a certain area, and then provided that "Any change of ownership of an existing business of the type herein defined shall be deemed a new or additional business." In a well-reasoned opinion this provision was held to be arbitrary and unreasonable, and to have no relation to the purposes of zoning. See *Jones v. City of Los Angeles,* 211 Cal. 304, 295 Pac. 14.

May a city by an ordinance given retrospective operation wipe out a vested right to put property to a lawful use? To put the question makes obvious the answer. See *Calton Court v. Switzer,* 223 N.Y.S. 856. Zoning ordinances should have a prospective operation; they look to the future, and to development within the confines of the law to the days ahead. *O'Connor v. Moscow,*

supra. It has been said "that a statute cannot be given a retroactive effect, and be made operative to affect rights and interests vested prior to its enactment." *Gardner v. Resumption M. & S. Co.*, 4 Colo. App. 271, 35 Pac. 674. See *U. S. v. McPhee*, 51 Colo. 425, 118 Pac. 996.

MR. JUSTICE SUTTON specially concurring in part and dissenting in part:

I

Although I am of the opinion that the particular zoning ordinance in question has in some particulars gone beyond the permissible limits of propriety and cannot meet certain constitutional requirements, I cannot agree with the majority opinion when it would deny to zoning authorities the right and power to adopt reasonable zoning laws which will properly regulate land and its use so that we city dwellers can live in a less frenetic and more orderly society.

It requires no citation of authority to establish that zoning is constitutionally possible only under the police powers of a state. In other words, all such ordinances or statutes must have a reasonable relation to the public health, safety or morals.

Let us examine the first question posed by the majority opinion and its answer relating to whether a municipality can require any type of off-street parking.

Admittedly off-street parking requirements for new construction or new uses of existing property dilute the bundle of an owner's rights, which in theory permits him to do whatever he chooses with his property. But such rights of ownership have never been absolute. Originally in England, from whence comes our common law, all property belonged to the Crown and ownership could revert to the King on failure of its possessor to perform certain conditions. Later the Crown lost these rights of reversion but the owner was required to pay taxes to the state for the privilege of ownership. Failure

to pay resulted then as now in the loss of the property to the government.

In other words, though we recognize and firmly believe in the right to acquire and own private property, property rights are not absolute and property bears its share of responsibility for the orderly functioning of government by carrying part of the tax burden with the corollary restrictions that it cannot be used to the detriment of the public, and is always subject to the police power. Thus, for example, the law for centuries has prohibited a man from creating or permitting nuisances on his land which annoy or harm the public or a member thereof; and, in the event of public disaster the state under its police powers can even destroy private property without liability for compensation to its owners.

Zoning and planning laws have evolved in modern civilizations to permit huge masses of people to dwell together in restricted areas with the least possible friction commensurate with the widest and freest use of the land used in such areas.

The determination of municipal officials in zoning matters should not be approached by the courts with a general feeling of suspicion (*Van Itallie v. Borough of Franklin Lakes* (1958), 28 N.J. 258, 146 A. (2d) 111). When zoning ordinances are reasonable and applied uniformly they do not violate due process of law (see *McMahon v. City of Dubuque, Iowa* (C.A. 8th Cir. 1958), 255 F. (2d) 154). Under general rules of construction courts have an obligation in construing the validity of city ordinances to apply such construction, if possible, as will avoid an unconstitutional result. (*City of New Orleans v. Leeco* (1954), 226 La. 335, 76 So. (2d) 387.) This is subject, however, to the exception that when the subject matter sought to be regulated is something which was permitted at common law, then the restriction is strictly construed in favor of the person against whom its provisions are sought to be applied. *Denver v. Thrailkill* (1952), 125 Colo. 488, 500, 244 P. (2d) 1074.

The latter does not mean, however, that the police powers can never be used to meet new situations which arise, for example, due to the growth of cities and vehicular traffic, and which need new but constitutional solutions. The exception is but one more test to properly protect freedoms against unwarranted governmental encroachment on private rights; it is not a bar to make government powerless to act for the general welfare under its police powers.

We live in a dynamic, growing society and what may have been unreasonable or arbitrary governmental interference or regulation in one period of our national history has often been recognized and accepted in later years as both necessary and constitutional when applied reasonably and equally to all people or property within a certain uniform class.

I firmly agree with the basic constitutional concepts set out by the majority opinion. It is in their application to some of the facts of this case that I respectfully dissent. In other words, the issue here is: what is a reasonable and necessary exercise of the police power? This degree of use " * * * cannot be disposed of by general propositions * * * " as the majority opinion so succinctly quotes Mr. Justice Holmes as saying in *Penn. Coal Co. v. Mahon* (1922), 260 U. S. 393, 43 S. C. 158, 67 L. Ed. 322.

This ordinance could not, contrary to the statement in the majority opinion, " * * * prohibit the use of that property for any purpose until its owners devote a substantial portion thereof to parking; * * *." In this regard I point out that the owners obviously can continue their present uses without interference and possibly change to others which do not require more parking area than may now exist.

It is not amiss to ask what is off-street parking attempting to do in this ordinance. Without determining whether this particular regulation is reasonable, it is obvious to all that traffic congestion and the need for

adequate parking is a public problem of paramount importance in Denver. The public welfare, if nothing more, would require public officials to seek reasonable and legal solutions thereto. Such officials recognize a duty not to let the public stew in its own juice, so to speak, of traffic confusion and parking. This ordinance seeks to help correct the problem by requiring owners to provide certain off-street parking if and when they build new buildings or make structural alterations or change their uses in zoning districts where the problem exists. The majority opinion states this can only be done by condemnation and payment of compensation from public funds, whereas I believe it is properly the subject of reasonable zoning regulations. Apparently many others concur, for by 1953, according to *Yokley on Zoning Law and Practice*, Vol. 2, 2nd Ed. §208, p. 76, " * * * 265 known localities in thirty-three different states have enacted (zoning) ordinances or amendments thereto requiring off-street parking accommodations for designated property uses." We can presume that in the interval the list has grown considerably larger.

In *McMahon*, supra, the federal circuit court not only upheld the constitutionality of an Iowa *zoning ordinance* but went on to point out that all regulations impose limitations upon the full use and enjoyment of property and in a sense take away property rights. *McMahon*, supra, cites *Anderson v. Jester* (1928), 206 Iowa 452, 221 N.W. 354, 357, which held: "That full use and enjoyment of a plot of ground is prohibited, that the excluded use is the most profitable to which the land can be put, or that the prohibition deprives the owner of profit that would otherwise be derived from such use, or that esthetic considerations incidentally enter into the determination does not invalidate the regulation."

The *McMahon* opinion further pointed out that though the zoning authorities had refused to rezone two corners of a wide intersection as commercial just because the other two were so zoned, was not illegal or arbitrary

saying it was a reasonable legislative determination that the district line should stop there; and it emphasized that lower market value and highest use of the land are not necessarily determinative factors to be considered in determining the validity of zoning regulations.

In *Colby v. Board* (1927), 81 Colo. 344, 225 Pac. 443, in discussing the constitutionality of a Denver zoning ordinance, this court pointed out that such laws are for the promotion of the public welfare and that "A full perspective (of community growth and development), however, in a case like this, requires not merely that the present be depicted, but that the future be envisaged."

In addition to *Yokley's* comments supra it appears that many jurisdictions recently have either by implication or express holding upheld the principle of reasonable off-street parking. Among those so holding by implication are: *Fleishon v. Phila. Zoning Bd. of Adj.* (1956), 385 Pa. 295, 122 A. (2d) 673 (permits revoked as not being valid because no access provided to parking space; however, required off-street parking was not ruled upon); *Hill v. Kesselring* (1949), 310 Ky. 483, 220 S.W. (2d) 858 (remanded for further hearing on adequacy of off-street parking, traffic hazards on deadend street, etc., for a proposed church); *Roselle v. Wright* (1955), 37 N.J. Super. Ct. 507 (ordinance required off-street public parking, petitioner desired permit for private storage of a few trucks and was denied it; reversed as to denial of off-street parking permit); *Ronda Realty Corp. v. Lawton* (1953), 414 Ill. 313, 111 N.E. (2d) 310 (off-street parking requirements only for apartment houses *and not for other multiple use buildings in same zone,* held discriminatory).

I find the following decisions upholding off-street parking in direct fashion: *Allendale Congr. of Jehovah's Witnesses v. Grosman* (1959), 30 N.J. 273, 152 A. (2d) 569; *City of New Orleans v. Leeco, Inc.,* supra (where one of several points decided was that defendant Leeco,

Inc., had complied with the off-street parking require-
ments for a theatre); *State v. City of East Cleveland*
(1958 Ohio), 153 N.E. (2d) 177 (owner sought permit to
build supermarket; one question involved was off-street
parking. Headnote 7 summarizes this point by saying:
"Zoning ordinance of city being within the exercise of
the police power, provisions thereof regulating off-street
parking are constitutional.").

The true test as to whether off-street parking is con-
stitutional seems to be whether the requirement is ap-
plied uniformly in a district and whether the amount
of space required bears a reasonable relation to the use
proposed. See 58 *Columbia Law Review* 666-667 (1958)
for a discussion of various lines of demarcation laid down
by the courts in various zoning controversies.

In *Allensdale,* supra, a church had been denied a
building permit because it did not propose to provide
the required off-street parking space required by the
zoning ordinance. The supreme court of New Jersey
unanimously upheld the denial saying that the require-
ment was not invalid on its face and did not violate
either the state or federal constitutions. I quote some
pertinent parts of the court's language:

"The plaintiff's real contention is that the off-street
parking requirements of the amendatory ordinance are
invalid on their face and as applied because they abridge
'freedom of assembly and worship contrary to the state
and federal constitutions.' We consider this contention
to be without merit. The off-street parking requirements
are made indiscriminately applicable to all buildings
where substantial numbers of people are likely to gather
via private motor vehicles and are well designed to pro-
mote the public safety and general welfare by lessening
'congestion in the streets.' See R.S. 40:55-32, N.J.S.A.;
James v. Bd. of Adjustment of Town of Montclair, 40
N.J. Super. 206, 212, 122 A. 2d 660 (Law Div. 1956); 2
Rathkopf, The Law of Zoning and Planning (3rd ed.
1956), 397. They do not restrict the plaintiff's freedom

of worship and assembly at its present quarters or at any suitable quarters in the AA residential zone or in any of the other zones in the borough or even at the plaintiff's relatively small lot on Hillside Avenue, if its plans are altered to reduce its proposed seating capacity and increase its proposed off-street parking facilities so as to comply with the terms of the amendatory ordinance. On the record before us we are not at all at liberty to say that the requirements have not been imposed in good faith and for the public interest or that they are unnecessary or excessive or that they are not substantially related to the promotion of the public safety and general welfare; they appear to come well within the principles expressed in cases which have heretofore held that property used for church purposes, along with property used for other purposes, may be lawfully subjected to reasonable zoning restrictions. (Citing numerous authorities.)

"In Appeal of Trustees of Congregation of Jehovah's Witnesses, Bethel Unit, 183 Pa. Super. 219, 130 A. 2d 240, 243 (Super. Ct. 1957), appeal dismissed for want of a substantial federal question 355 U.S. 40, 79 S.Ct. 120, 2 L.Ed. 2d 71 (1957), the Borough of Bethel had adopted an ordinance which contained an off-street parking requirement applicable to churches, schools, auditoriums, stadiums and similar places of assembly; it also provided that no such places shall be permitted within $\frac{1}{4}$ mile of each other. In a decision adverse to the appellant Jehovah's Witnesses, the board of adjustment found that its proposed church premises violated the off-street parking requirement and the $\frac{1}{4}$ mile requirement. The Pennsylvania court, in sustaining the board's decision, first noted that each of the requirements bore a reasonable relation to the safety of the public and then made these comments which are fully applicable here:

" 'Certainly freedom of worship does not mean that churches are exempt from reasonable police power regulations. Our Supreme Court in Kurman v. Zoning Board

of Adjustment of City of Philadelphia, 351 Pa. 247, 40 A. 2d 381, determined that setback requirements are applicable to properties used for church purposes. The concepts of religious freedom, freedom of speech and the press which are embodied in the First Amendment have never been construed as absolute rights and beyond the power of reasonable regulation under the police power. Board of Zoning Appeals of Decatur v. Decatur, Ind. Co. of Jehovah's Witnesses, 233 Ind. 83, 117 N.E. 2d 115, 123. The language used at page 123 of 117 N.E. 2d [dissenting opinion] is applicable to the present case: 'It is quite evident that the members of the appellee could be killed just as dead going to and from church as going to and from a theater or a basketball game. It is a proper exercise of the police power to protect appellee's members from their own negligence as well as from the negligence of the traveling public. There would be just as much logic in holding that the members of appellee when going to church were not required to comply with the traffic regulations as in holding that the appellee is not required to make reasonable provisions for a lessening of the traffic hazards by off-street parking.

" 'If it was a proper exercise of the police power for the city by its zoning ordinance to require the appellee to comply with the average setback line of the residences, which only has a very remote bearing on traffic hazards, a fortiori it was a reasonable exercise of the police power to require appellee to provide space for 25 cars to park off the streets. The right of appellee to exercise its religious freedom is not violated in either case.' " (Citing numerous authorities.)

As I see it, times have changed, and the constitutional police power of the states is now being recognized in this country as the only reasonable and practical way to cope with this ever growing Frankenstein called "Traffic congestion." It is my firm belief that such regulations,

when reasonable and applied equally, are not only constitutional but necessary to urban survival.

In *Brodhead v. Denver* (1952), 126 Colo. 119, 247 P. (2d) 140, this court recognized the validity of Denver's attempt to solve this problem in some measure by creating publicly owned off-street parking facilities. But as in most communities where this has been done it has not been enough. *Yokley* in Vol. 2 at page 78 says about this problem:

"It must be beyond debate that the private parking lot and the private parking garage have failed to meet the crisis and solve the problem in most large cities. This failure has brought into being a two-fold muncipal activity — the public parking of automobiles and the inclusion of off-street parking provisions in municipal zoning ordinances."

And on page 82 in Vol. 2 *Yokley* says:

"The question that has occurred to many thoughtful communities, as the passing of time has aggravated the problem of traffic congestion, is this: We have building codes and master plans and their policing partner, the zoning law; why then, can they not be put to good use by requiring, at least in the case of new construction, that reasonable off-street parking facilities be furnished for the employees and patrons of the building so constructed and used?

"Thus, in the areas immediately outside the central business district, the theatre, the department store, the medical center, the commercial business, the industrial plant, the super-markets, the streamlined drug store — all would be required to have some care and responsibility for the parking problems of their employees and patrons without requiring the public agency to step in and take a hand in clearing the streets of vehicular traffic.

"It is beyond debate that some businesses, by their very nature, attract vehicular traffic and create congestion in the public thoroughfares. What have the mu-

nicipalities done to solve this problem from the stand-point of zoning?"

Another well known authority ("Municipal Law" (1957) by Charles S. Rhyne, page 967) has commented on this as follows:

"Off-street parking requirements for dwellings, apartments, businesses, theatres, churches and other uses are common in zoning ordinances today. A recent decision by the Supreme Court of Illinois held that a Chicago zoning ordinance requiring apartment houses to provide private garages or automobile compounds for its tenants was invalid as discriminatory since boarding houses, rooming houses and similar uses which create traffic and other problems were not required to comply with this requirement. (Ronda Realty Corp. v. Lawton, 414 Ill. 313, 111 N.E. 2d 310, 312-13 (1953)). But similar provisions in other zoning ordinances have been sustained. Thus zoning ordinances have been held valid which required theatres to provide one parking space for each eight seats; (New Orleans v. Leeco, Inc., 226 La. 335, 76 So. 2d 387, 390 (1954)) and lunch counters, (Mirschel v. Weissenberger, 277 App Div 1039, 100 NYS 2d 452 (1950), no confiscation or discrimination shown.) and churches (Hill v. Kesselring, 310 Ky. 483, 220 SW 2d 858, 861-63 (1949).) to furnish suitable parking facilities. However, the latter case was remanded to the lower court for additional evidence on the adequacy of the off-street parking facilities to be furnished by the church. But a zoning ordinance requiring 'all places of assembly' to provide 100 square feet of off-street parking space for every person in attendance was held not a valid reason for denial of a building permit for a church which had more off-street parking space than the seating capacity of the church. (State v. Tampa, 48 So. 2d 78 (Fla. 1945), mandamus granted to compel issuance of building permit because there had been substantial compliance and because there was no showing of a connection between the ordinance and public health, safety,

and morals.) Likewise, a zoning ordinance requiring one off-street parking space for every six seats in a church was held unconstitutional as a restraint upon the right of freedom of worship and assembly, and unreasonable in view of the fact that services would be held during minimum traffic hours and sufficient parking space for all vehicles was available for all ordinary services. (Board of Zoning Appeals v. Decatur, Ind. Co. of Jehovah's Witnesses 233 Ind. 83, 117 NE 2d 115, 119-21 (1954).)." (Cases cited are inserted from footnotes.)

One of the public purposes of zoning and planning is "to lessen congestion in the streets" and the 1923 Denver Charter Amendment (Sec. 219A, §3) expressly so provides. Heretofore some traffic congestion has been solved by public parking garages, by prohibiting all parking on certain thoroughfares and by restricting the period of time one may park in other areas. Some cities have even found it necessary to prohibit all stopping of vehicles on certain highways. All this is done in the exercise of the police powers of the state or city.

The reasoning of the majority opinion is that it is a taking of private property for a public use without condemnation and just compensation to require even reasonably computed off-street parking. I fail to see how that is so if an ordinance only requires an owner to provide parking on his own property for his own vehicles, or a reasonable amount of parking space for himself and those who use his property. In reality it is an application to zoning of the accepted but distinct nuisance principle that one shall not so use his property so as to interfere with either his neighbors or the public. When parking is an incident of a new land use, why should it not be required on the land itself just as the type of business or residential use can itself be lawfully regulated?

The specially concurring opinion of Mr. Justice Frantz goes further than the majority opinion and urges that if the off-street parking is only for persons going to the building in question " * * * then it is a taking for pri-

vate use, a taking of more doubtful validity." For the reasons herein set forth I cannot agree that this principle results in a taking of property or that it is of doubtful validity. It is primarily for the public welfare and to lessen congestion in the streets. The fact that incidentally it is also for the use and benefit of those who use the property in question does not suffice to void it.

Clearly the law could not require an owner to permit the general public to use his property for parking purposes, but that is not the case here. It is only the reasonableness of this requirement that we should concern ourselves with since I consider the principle itself to be a proper constitutional exercise of legislative power. And, if necessary I would remand this action to the trial court for the taking of testimony on the need and reasonableness of the regulation and for a determination thereof.

The majority opinion labels this requirement " * * * a price tax or tribute for the exercise of the constitutional right to do business * * *," which in my opinion ignores the widely recognized right and power of governments, local, state and national, to not only tax businesses but also the right to regulate them when deemed reasonably necessary for police purposes or to prevent nuisances.

I need not describe here the various types of provisions which exist elsewhere in other zoning ordinances detailing how off-street parking should be computed. Suffice it to say that representative samples appear in *Yokley,* supra, and in *Rathkopf,* 3rd ed. on *"The Law of Zoning and Planning."*

Thus contrary to my learned colleagues, I conclude that reasonable off-street parking requirements, when equally applied, do not "unreasonably and unnecessarily fasten upon him (the citizen) new restraints upon freedom of action in the use and enjoyment" of his property as the majority opinion states. I urge that we declare this part of the ordinance invalid only if we are convinced after a thorough study that these particular pro-

visions are unreasonable and, as pointed out above, before we can determine that question evidence should be taken upon a retrial of the action. This would allow the city to correct its error by amendment if it in fact has erred. I also concur with Mr. Justice Doyle in his dissenting opinion filed in this case as to the views he expresses and authorities he cites on the need for and validity of reasonable off-street parking requirements.

II

As to the second question posed by the majority opinion and its answer thereto I am in general agreement that this particular non-conforming use proviso is unconstitutional but only for the reasons hereafter given.

It seems to me that this provision of the ordinance by imposing so many restrictions on non-conforming uses, passed into the constitutional danger zone and made a fetish out of excessive regulation of property and uses to the point where property owners are unduly, unreasonably and unconstitutionally restricted as to non-conforming uses. Though those who designed the specifications, and chose the terms used, are no doubt sincere and competent planning engineers, they neglected to consider the constitutional rights of those who own property affected by non-conforming uses. In other words, professional planners sometimes see only a vision of the ideal city or metropolitan area in which all businesses and industries are restricted to planned areas. While this may be a "consummation devoutly to be wished," planners are confronted with the fact that they are not starting with vacant unoccupied land, hence they, as well as the courts, are restrained by those limitations which the constitutions set up as barriers to an invasion of personal and property rights. These protect each of us in our property rights, subject to such reasonable restraints as suggested above in discussing off-street parking requirements. In my view it is the task of this court to evaluate the facts to determine if a valid end to which the legislation is related has actually been demon-

strated (see *Uphause v. Wyman* (1959), 360 U.S. 172), having in mind at all times that *public necessity* in the protection of the health, morals or safety of the public is the keystone upon which regulations by use of the police powers depends. It is one thing to say that traffic and parking *must be* regulated, directed and restrained in the public interest, or we will have a complete morass of danger and confusion, and on the other hand to say we *should have* an esthetically beautiful city, which can be accomplished only if all non-conforming uses are eliminated. The elimination of such uses, though possibly a desirable ideal, cannot be attained by either prohibition without just compensation, or by so fettering the citizen that he cannot use his property in a reasonable manner.

The majority opinion calls attention to some of the shackles which this ordinance would, I believe, unconstitutionally lock upon the rights of the owners of nonconforming uses. I add some additional comments: For example, a non-conforming use, being a use protected as a constitutional property right, like all other property is subject to the police power of the state to reasonably regulate to promote the public health, safety or morals. I cannot say that it appears unreasonable or unconstitutional to require that if a building is so completely destroyed as to require razing or rebuilding, it should not be rebuilt contrary to the building code or zoning ordinance of the district where it was located. This is because the non-conforming features have been eliminated through happenstance or Act of God, giving the legislative body the opportunity to take a step forward in its comprehensive plan. Also, if reasonable, the courts should uphold a percentage destruction figure that will help to accomplish uniform zones over a period of time when destruction of a use has occurred.

As to the abandonment of a non-conforming use we should also uphold reasonable legislative acts relating thereto when they are made *prima facie* evidence of intent to abandon. In this regard the one year period

provided here seems highly unreasonable. I am persuaded that compulsory registration, obsolescence, or doing prohibited acts under the zoning ordinance, under penalty of forfeiting a lawful property right, are all illegal and improper methods to attain the desirable objective of a well planned city and the majority opinion properly rejects them. This is not to say, however, that some reasonable type of registration or the reasonable consideration of deterioration of buildings may not be inserted in a zoning ordinance relating to non-conforming uses.

Probably America's first zoning authority in point of time is *Bassett on "Zoning"* (1940) where at page 105 it is stated: "Nonconforming buildings and uses existing when an ordinance goes into effect are allowed to continue. * * * Zoning seeks to stabilize and protect and not to destroy." *Bassett* then points out that such uses should not be allowed to enlarge or increase where harmful or improper in a district.

The development and refinement of zoning ordinances since 1940 have, as I view it, done the following to the concept of non-conforming uses: (1) Allowed variances within districts, but this right is being abused in some municipalities so that the over-all purpose of the zoning laws to restrict new non-conformities is being defeated. This is usually the fault of the Boards of Adjustment who permit legally unnecessary exceptions. (2) The principle of "Amortization" has developed, which recognizes that if a use is both non-conforming and small in monetary value that then it need be allowed to exist only for a period of time which is adequate to allow the owner to recover his reasonable investment therein. (See Vol. 44, No. 3, *Cornell Law Quarterly, Spring 1959*, page 450 et seq. and cases cited therein.) (3) The erroneous concept has arisen, as stated supra in this dissent, that the purpose of limiting non-conforming uses is to destroy them. The reason why the latter is objec-

tionable is because it fails to recognize that these uses are a matter of right, not of privilege.

### III

The majority opinion, like the trial court, finds that this ordinance unlawfully and unconstitutionally places so-called down town Denver in one business zone and arbitrarily denies the same type of zoning to plaintiffs' lands which for many years have been used for similar business purposes. I believe this to be a matter of legislative discretion. Though the uses may be similar in great part in both zones, the types of structure obviously are not the same in many particulars, nor is the nature or character of the business carried on generally the same. I would also remand this phase of the proceedings to the trial court to take and hear evidence thereon to determine the reasonableness thereof. And, if reasonable, as well it might be, for differences are apparent to all who view the Denver skyline, I would uphold such a classification.

### IV

The majority opinion holds that all the permits sought herein should issue because this ordinance cannot be held to be retroactive, Article II, Section 11, of the Colorado Constitution being cited in support thereof. I agree that any of these plaintiffs, and all others similarly situated, who had applied for permits under the prior ordinance and before the adoption of this one, must now, and from the beginning should have been given their building permits, subject to the terms of the former ordinance. I so concur, fully aware that in *Colby,* supra, at page 352 this court had held that no one can secure vested rights against the operation of the police power.

Heretofore the attitude of this court, as well as those in many other jurisdictions, has been as expressed in *Colby* (see 8 *McQuillian "Municipal Corporation,"* 3rd ed. 471, §25.181; and *Allendale,* supra). However, *Colby* neglected to consider the Colorado constitutional provision cited by the majority herein and we are of course

bound by the latter and I would expressly overrule *Colby* on that point. Even if we were not so bound it seems to me that only in the rarest of instances could a zoning authority be justified under the police power in denying a permit under existing law while a new ordinance or an amendment to an existing ordinance is being drafted and adopted. Each of such cases would have to rest on its own facts and a real emergency be shown before I could support such reasoning. This is so because it is palpably unjust, for example, to say that an owner who has spent large sums on plans and specifications, in reliance on the law as it is, should forfeit his rights and what he has spent on architects' fees for the public good without just compensation. It seems to me that in all cases, except in case of an actual crisis in public health, morals or safety, builders should have the right to rely upon the law as it is, not what some public official thinks it should or will be at some time in the future.

To summarize, I would hold the concept of off-street parking valid; hold this particular non-conforming use section invalid; hold the zoning district classifications in question valid; and order certain permits issued as indicated. If we deem it necessary to have more evidence to reject or sustain this particular off-street parking section or the zoning classification in question, I would remand the case to the trial court to determine these matters after hearing further evidence thereon.

Mr. Justice Doyle dissenting:

I respectfully dissent from the decision and reasoning expressed in the majority opinion. My objections fall into two classes and I shall preface my specific objections with some general observations.

*First,* the opinion seems unlimited in its sweeping terms. It expresses a philosophical aversion to all zoning efforts. The decision itself is limited to a holding that the off-street parking and non-conforming use provisions

of the zoning ordinance are invalid. Its expressions of viewpoint are at variance with the basic premise that a city can be planned and that restrictions for the general good of the community can be imposed. While conceding that arbitrary regulation of property is invalid, I had thought that the power of the municipality to impose restrictions in the interests of the community so basic and fundamental that it cannot now be questioned. From earliest times restrictions on the use of property have been a necessary product of the development of the town or the urban community. Such restrictions are upheld unless shown to be arbitrary and capricious.

In the year 1923 the City of Denver enacted a Charter Amendment (Sec. 219 A) which authorized in broad and general terms the enactment by council of zoning and planning legislation. Sections A, B and C emphasize the scope of this grant of power and read as follows:

"A—GRANT OF POWER. For the purpose of promoting health, safety, morals or the general welfare of the community, the council of the city and county of Denver is hereby empowered to regulate and restrict the height, number of stories and size of buildings and other structures, the percentage of lots that may be occupied, the size of yards, courts and other open spaces, the density of population and the location and use of buildings, structures and land for trade, industry, residence or other purposes.

"B—DISTRICTS. For any or all of said purposes, the council may divide the city and county of Denver into districts of such manner, shape and area as may be deemed best suited to carry out the purposes of this amendment; and within such districts it may regulate and restrict the erection, construction, reconstruction, alteration, repair or use of buildings, structures or land. All such regulations shall be uniform for each class or kind of buildings throughout each district, but the regulations in one district may differ from those in other districts.

"C—PURPOSES IN VIEW. Such regulations shall be made in accordance with a comprehensive plan, and designed to lessen congestion in the streets; to secure safety from fire, panic and other dangers; to promote health and the general welfare; to provide adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population; to facilitate the adequate provisions of transportation, water, sewerage, schools, parks and other public requirements. Such regulations shall be made with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout the city and county of Denver."

Early decisions of this Court have also recognized the need for this type of regulation. See, for example, *Colby v. Board of Adjustment of Denver, et al.* (1927), 81 Colo. 344, 255 Pac. 443, which noted the passing of the horse and buggy era and wherein it was stated:

" * * * The justice writing the opinion in *Village of Euclid v. Ambler Realty Co.,* supra, remarks on the decided trend of opinion toward a broader view of zoning ordinances, and refers to state courts reversing themselves, citing instances. Even so, we do not apprehend that we are now offending the rule of stare decisis, as applied to any of our previous decisions. We are only applying old principles to new conditions, or to the changed facts of modern life. Thus, a horse and buggy day decision in the livery stable case, *Phillips v. City of Denver,* 19 Colo. 179, 34 Pac. 902, intimately allied with those times, would be incongruous now if not considered in the light of modern industrial and civic development. It would be applying the law to an obsolete situation. The same may be said of brickyards in a residence zone under the state of this record. * * * "

In a more recent decision, *Cross v. Bilett,* 122 Colo.

278, 221 P. (2d) 928 (1950), the Court commented as follows:

" * * * With the growth of congested urban populations, containing areas of attractive residential development, with values greatly dependent on conformity, and with the increasing concern for quiet, safety and beauty, there have been enacted zoning laws under appropriate legislative or constitutional authority in most municipalities in the United States and in many rural areas. The concept of public welfare thereunder has broadened. Under such ordinances uses permitted and legal in one district of the city are prohibited in another. Such prohibition is based not strictly upon the inherent danger to the public health, public morals, the public safety, or the public welfare of the prohibited use generally, but upon its interference with the appropriate use of property and the maintenance of its value in the zone in which such use is sought. We have repeatedly upheld such restrictions. So in *Flinn v. Treadwell,* 120 Colo. 117, 207 P. (2d) 967, we held invalid a provision requiring in a 'B' residential district a front yard of not less than twenty-five feet in depth, directly contrary to the old ruling in *Willison v. Cooke,* supra. * * * "

An early definitive and recognized decision upholding zoning is that of the Supreme Court of the United States in *Village of Euclid v. Ambler Realty Co.* (1925), 272 U.S. 365, 47 S. Ct. Rep. 114. Mr. Justice Sutherland, who was not noted for his liberal economic philosophy, nevertheless recognized that the community has the power to impose restrictions on the use and occupation of lands in urban communities. It was there stated:

" * * * Building zone laws are of modern origin. They began in this country about 25 years ago. Until recent years, urban life was comparatively simple; but, with the great increase and concentration of population, problems have developed, and constantly are developing, which require, and will continue to require, additional restrictions in respect to the use and occupation of pri-

vate lands in urban communities. Regulations, the wisdom, necessity, and validity of which, as applied to existing conditions, are so apparent that they are now uniformly sustained, a century ago, or even half a century ago, probably would have been rejected as arbitrary and oppressive. Such regulations are sustained, under the complex conditions of our day, for reasons analogous to those which justify traffic regulations, which, before the advent of automobiles and rapid transit street railways, would have been condemned as fatally arbitrary and unreasonable. And in this there is no inconsistency, for, while the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation. In a changing world it is impossible that it should be otherwise. But although a degree of elasticity is thus imparted, not the *meaning,* but to the *application* of constitutional principles, statutes and ordinances, which, after giving due weight to the new conditions, are found clearly not to conform to the Constitution, of course, must fall. \* \* \* ''

The majority opinion here quotes from Mr. Justice Holmes in an eminent domain opinion, which apparently dealt with what constitutes a taking. However, that distinguished jurist acknowledged that the state has the authority to impose restrictions for the general good and that it is not the function of a judge to substitute his own economic and political viewpoint for that of the legislature. In his now famous dissenting opinion in the case of *Lochner v. New York,* 198 U.S. 45 (1905), he stated:

" \* \* \* This case is decided upon an economic theory which a large part of the country does not entertain. If it were a question whether I agreed with that theory, I should desire to study it further and long before making up my mind. But I do not conceive that to be my duty, because I strongly believe that my agreement or disagreement has nothing to do with the right of a majority

to embody their opinions in law. It is settled by various decisions of this court that state constitutions and state laws may regulate life in many ways which we as legislators might think as injudicious or if you like as tyrannical as this, and which equally with this interfere with the liberty to contract. Sunday laws and usury laws are ancient examples. A more modern one is the prohibition of lotteries. The liberty of the citizen to do as he likes so long as he does not interfere with the liberty of others to do the same, which has been a shibboleth for some well-known writers, is interfered with by school laws, by the Post Office, by every state or municipal institution which takes his money for purposes thought desirable, whether he likes it or not. The *Fourteenth Amendment does not enact Mr. Herbert Spencer's Social Statics.* The other day we sustained the Massachusetts vacinnation law. * * * " (Emphasis supplied.)

Another expression of the basic philosophy that community existence requires curtailment of rights is found in the opinion of Chancellor Earl in *Losee v. Buchanan* (1873), 51 N.Y. 476.

"By becoming a member of civilized society, I am compelled to give up many of my natural rights, but I receive more than a compensation from the surrender by every other man of the same rights, and the security, advantages and protection which the law gives me. * * * We must have factories, machinery, dams, canals, and railroads. They are demanded by the manifold wants of mankind, and lie at the basis of all our civilizations. * * * Most of the rights of property, as well as of the person, in the social state, are not absolute but relative, and they must be so arranged and modified, not unnecessarily infringing upon natural rights, as upon the whole to promote the general welfare."

*Second,* the third part of the majority opinion wherein the classification of B 5 and B 6 is condemned as an unlawful discrimination is especially broad in its effect. It appears to kill all the regulations in the B 6 zone in

one fell swoop without regard to whether they are reasonable or arbitrary, applicable or inapplicable. This ruling is certain to leave chaos and uncertainty in its wake. Does the 1925 ordinance with its onerous height and other restrictions now apply in this B 6 section or is this section now free altogether from any zoning regulation? These and other equally difficult questions will have to be faced as the aftermath of the "tornado" which is the majority decision.

*Third,* fundamental canons of procedure have been overlooked. This legislation cannot be judged by a mere reference to its terms. It is not invalid *per se.* If a judgment were to be made from examination of the legislation alone, it would be more logical to conclude that it is well founded factually and that it does bear a relationship to the public health and safety. The plaintiffs can succeed in this case, according to my view, only by proving the unconstitutionality of this legislation beyond a reasonable doubt. See *Consumers League of Colorado, et al. v. Colorado & Southern Railroad Company,* 53 Colo. 54, 125 Pac. 577; *People ex rel. Rogers v. Letford,* 102 Colo. 284, 79 P. 274; *Mosko v. Dunbar,* 135 Colo. 172, 309 P. (2d) 581.

The instant legislation has been killed without even requiring proof of its invalidity. In fact, the court refused to allow the plaintiff to introduce evidence to show the reasonable basis for its enactment. It strikes me that a question which has the scope and magnitude of that before us should not be decided in a vacuum; evidence should be received to the end that the court might be in a position to determine whether the enactment as applied to the facts is reasonable or arbitrary.

I also have *specific* objections to the rulings of the majority.

1. *Off-Street Parking.*

If the court had determined that these particular off-street parking requirements were unnecessary, unreasonable and onerous as applied to these plaintiffs and

the uses which they have proposed, I would be inclined to concur in the decision. I cannot, however, join in a condemnation of all off-street parking as an invalid exercise of the police power. It is not possible to conclude in the absence of evidence that the land use and the parking requirement ratios which are set up in the ordinance are unreasonable, and it is impossible to conclude that such requirements do not contribute to a solution of the tremendous urban problem of traffic congestion. On the other hand, no evidence is needed to establish that this is a problem of great magnitude and that it is not going to go away by the simple expedient of ignoring it. The number of automobiles and the extent and consequent traffic congestion will constitute a problem at all times in the future. Courts are not better qualified to solve these questions than legislators and enactments which are intended to look toward such solutions should not be voided merely because we might disagree with them.

The majority fail to cite any decisions which specifically support its conclusion. There are cases which hold particular off-street parking requirements invalid upon the basis of their special arbitrariness. All of these, however, proceed on the premise that off-street parking generally is valid. See *Rhyne, Municipal Law,* 967.

The relationship of off-street parking to the general welfare is ably outlined in 2 *Yokley, Zoning Law and Practice* (2d ed.), 76, 77, 78:

"While traffic is not the moving factor in the drafting of zoning ordinances, most comprehensive zoning ordinances now make some provision for the proper programming of present and future traffic improvements. It has been found that this can best be done through the medium of off-street parking requirements for certain classes of buildings and structures.

"Amendments to zoning ordinances incorporating off-street parking requirements are now widespread in application, many cities having found that provisions in

zoning ordinances which make imperative the provision for parking facilities constitute an excellent application of the zoning concept in alleviating traffic congestion.

"At this writing it appears, from information furnished by David R. Levin, Chief of the Land Studies Section of the Bureau of Roads, Department of Commerce, that 265 known localities in thirty-three different states have enacted ordinances or amendments thereto requiring off-street parking accommodations for designated property uses.

"The effects of zoning on transportation are immediately apparent when it is realized that the volume of the traffic which the urban street must accommodate is directly related to the height, bulk and function of the buildings comprising the community.

"As we have had occasion to state before:

" 'Among the many problems pressing for solution in the crowded metropolitan areas of America, traffic congestion still takes its rightful place near the top of the list.'

"For our cities to prosper, it is imperative that an adequate supply of off-street terminal spaces be provided, particularly in central business districts, in order to meet the ever expanding demand for the parking of automobiles. It is equally as essential to provide for off-street truck berths. The use of curb spaces for the parking of autos and loading and unloading of trucks blots out a final hope for vehicular capacities of city streets already bled white by the many encroachments thereon. Increasing proportions of the population prefer private autos to mass transportation for travel to central business districts and employment centers. Nothing could better illustrate this than the arguments of mass transportation utilities for higher fares in order to meet increased operating expenses in the face of revenue losses due to decreased patronage by former riders who prefer to use private transportation facilities. This ar-

gument highlights almost every rate hearing in which increased fares are sought.

"It must be beyond debate that the private parking lot and the private parking garage have failed to meet the crisis and solve the problem in most large cities. This failure has brought into being a two-fold municipal activity — the public parking of automobiles and the inclusion of off-street parking provisions in municipal zoning ordinances. * * * "

The decisions which uphold off-street parking generally deal in each instance with the legality of the specific regulation as applied to particular fact. This is apparent from the discussion in *Rhyne,* supra. No case that we have been able to find invalidates the *principle* of off-street parking. For example, in *City of New Orleans v. Wimberly,* 226 La. 335, 76 So. (2d) 387, the Court enforced an off-street parking requirement as applied to movie theaters. In *Roselle v. Wright,* 37 N.J. Super. 507, 117 A. (2d) 661, the Court held an off-street parking requirement for a storage garage to be unreasonable in view of its particular terms, but at the same time recognized the validity of such regulation where it bears a substantial relationship to the public health, safety, morals or general welfare. The Court said:

" * * * That provision as applied to stores, warehouses, office buildings, or other commercial structures, to which it may reasonably be anticipated large numbers of people would come by means of automobiles, thus giving rise to congestion in the public streets, appears to be entirely reasonable and logical. * * * "

See also *Allendale Congregation of Jehovah's Witnesses v. Grossman* (1950), 30 N.J. 273, 152 A. (2d) 569. This holds a requirement of one parking space for every three seats in a church to be reasonable.

*State v. City of East Cleveland* (1958), (Ohio) 153 N.E. (2d) 177, recognizes that such provisions are valid and cites *McSorley v. Fitzgerald,* 359 Pa. 264, 59 A. (2d) 142, and many other cases which deal with similar and

related problems. *Mirschel v. Weissenberger,* 277 App. Div. 1039, 100 N.Y.S. (2d) 452, recognizes the general validity of such requirements and also holds that the vesting of authority in a board to make particular determinations does not constitute an unlawful delegation of legislative authority. See also *Fleishon v. Philadelphia Zoning Board,* 385 Pa. 295, 122 A. (2d) 673, and *Hill v. Kesselring,* 310 Ky. 438, 220 S.W. (2d) 858, and see *Foronoff, The Relationship of Zoning to Traffic Generators,* 20 *Law and Contemporary Problems* 197 (1955). *Town of Islip v. Summers* (1931), 257 N.Y. 167, 177 N.E. 409, is analagous in that it upholds a zoning ordinance requiring building setbacks. The language of the Court per Pound, J., is here relevant:

"The question is whether the zoning ordinance of the town of Islip is unconstitutional in so far as it requires a setback of ten feet from the street on that part of Montauk avenue which is zoned for business purposes. The court below has held that such ordinance is detrimental and prejudicial to the use of the premises for building purposes, and unconstitutional as a taking of private property for public purposes without just compensation.

"[1] Can it be said that the ordinance in this respect on its face 'passes the bounds of reason and assumes the character of a merely arbitrary fiat?' Village of Euclid, Ohio, v. Ambler Realty Co., 272 U.S. 365, 389, 47 S.Ct. 114, 119, 71 L. Ed. 303, 54 A.L.R. 1016. 'If the validity of the legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control.' Village of Euclid, Ohio, v. Ambler Realty Co., supra, page 388 of 272 U.S. 47 S.Ct. 114, 118; Wulfsohn v. Burden, 241 N.Y. 288, 296, 150 N.E. 120, 43 A.L.R. 651.

"[2] In the light of these rulings, how can a court say upon mere inspection of the zoning ordinance that the end in view is not reasonably pursued by its adoption in order to lessen congestion in the streets and thereby

to promote the public safety? Town Law, Consol. Law, c. 62, §349-o. * * * "

In summary, I am of the opinion that the off-street parking regulations which the majority holds invalid are not *per se* unconstitutional. Moreover, the evidence at the trial fails to demonstrate specific invalidity as applied to plaintiffs and does not establish beyond reasonable doubt a lack of relationship between these regulations and the public health, safety and welfare. They should, therefore, be upheld.

2. *Invalidity of the Non-Conforming Use Provisions.*

The majority opinion determines that the restrictions which were incident to the grant of non-conforming uses are so "onerous and unreasonable" as to be invalid. To my mind, this holding is not here justified. In the first place, the non-conforming use is a fundamental aspect of any comprehensive zoning law. It merely declares that a use existing at the time of the enactment of a zoning ordinance may be continued though it is not in harmony with the character of the zone or district which is created by the law. In effect, therefore, it is a recognition of a right to continue an existing use and is in legal effect a saving clause which protects a zoning ordinance from the charge that it is retroactive. The philosophy behind the non-conforming use is well expressed in a case note recorded in 44 *Cornell Law Quarterly*, 451, 452:

"Ever since the landmark case of Village of Euclid v. Ambler Realty Company, the power of a municipality to pass reasonable zoning ordinances has been firmly established. This case settled the controversy over prospective regulation of undeveloped land, but left unresolved the problem of how to deal with previously existing nonconforming uses, which were long believed to be entitled to constitutional protection as vested property rights.

"Ideally, in order to achieve the perfectly planned city, a city zoning plan should start with virgin terri-

tory. There, everything could at the outset be put in its proper place or zone and, theoretically, there would be complete conformity. Obviously, this situation was not present in most areas of the United States. As a result, when zones were set up in already developed areas, those who established the zones had to harmonize, as best they could, various pre-existing uses of the land. These pre-existing uses, established before the zones were set up and allowed to continue in technical violation of the zoning law, are called prior nonconforming uses.

"Generally, prior nonconforming uses were allowed to continue for two basic reasons: (1) Because it was felt that zoning laws could not constitutionally be applied retroactively to deprive the owner of his nonconforming use, and (2) because zoning looks primarily to the future and 'seeks to stabilize, and protect and not to destroy.' In the early stages of zoning, it was believed that prior nonconforming uses would eventually eliminate themselves over a period of years through abandonment, destruction and other normal changes. Contrary to these expectations, nonconforming uses still abound. It is frequently said that the primary problem facing zoning is elimination of the nonconforming use."

These provisions have been generally upheld by the courts and certainly they have never before been condemned in the abstract, that is, in the absence of a showing by a plaintiff that a particular restriction deprives him of some right. See 1 *Yokley, Zoning Law and Practice,* §§ 149, 151, 156, 157, and *Rathkopf, Law of Zoning,* Chapters 60, 61 and 62, also 8 *McQuillen, Municipal Corporations,* pp. 464, 465.

Examination of the instant ordinance does not indicate that its terms are palpably unjust. The ordinance does not, for example, require the use to be *eliminated* after a period of time. It merely demands that the use be reported and that permission be obtained before any major structural change is made. It also provides that

the right can be abandoned under certain circumstances such as one year vacancy, and that it can be lost by destruction of the building as the result of a fire or a force of nature. Such restrictions are not specifically in question and their mere presence in the ordinance does not justify a holding that the ordinance is *per se* invalid. A particular deprivation of right may in a given case justify a holding that some one restriction is arbitrary and oppressive, but that is not the present case. This is an injunction suit and not a declaratory judgment action.

The majority ruling is so fundamental as to constitute a condemnation of all zoning and planning because if changes cannot be made which look to eventual elimination of non-conforming spot areas, the plan itself is undermined to the point that it means little or nothing.

Nor can I agree with the majority's conclusion that the city council did not have the power under Section 219 A of the Charter to provide for non-conforming uses. As indicated above, this is authority which need not be specifically set forth. It is a fundamental part of any comprehensive plan. For these reasons, I disagree also with this determination.

3. *Authority of the City Council to Distinguish Between the B-5 and the B-6 Districts.*

The holding of the majority that there is no appreciable difference between the downtown property and that which is South of Colfax Avenue, the dividing line adopted by the City Council, ignores the facts. To be sure, there may be similarities between the two districts, but there are also substantial differences which justify the adoption of the dividing line. Certainly the legislature must be in a position to create districts and to determine differences and to declare land uses in accordance with its findings. The Charter provision itself which the majority considers narrow in scope and which I regard as broad and comprehensive certainly contemplates this type of legislative decision. We need only look out of the windows of our own offices to observe

the very marked differences. The B-6 district by no stretch of the imagination can be classified as a concentrated commercial area such as B-5. The ground South of Colfax Avenue, which is here in question, is in the process of changing from residential to commercial. The Council has classified it as a secondary rather than a primary commercial district, and it is within its power, as I view it, to so determine. Adoption of ground rules to govern *development* is much easier than adoption of rules which seek to effect changes after the area has quickened and it cannot be said that the classification of this district as a secondary commercial area is unreasonable or unrealistic. On the contrary, the holding that there is no appreciable difference between this district and the traditional "downtown" district seems to me to be extremely unrealistic and arbitrary.

Finally, I fail to see that it is unreasonable discrimination to require this developing commercial area to provide off-street parking. The impossibility of requiring off-street parking in the so-called downtown district is at once apparent. It seems to me reasonable to distinguish between these two areas and to demand that new constructions in the developing commercial area comply with the off-street parking requirement.

4. *The Question Whether This Legislation Is Invalid by Reason of its Being Retrospective.*

Merely because the plaintiffs applied for building permits prior to November 7, 1956, the effective date of this ordinance, does not mean that it may not be constitutionally applied to them. In order to hold that legislation is invalid because of its being retrospective, it must appear that the provision authorizing retrospective application is more than just form and operates so as to deprive them of a substantive right that had matured prior to the enactment of the ordinance. I cannot agree that the mere application for a building permit can result in one's having a vested right to build in accord-

ance with the application, and that is the effect of the majority's alternative holding.

The holding that the mere filing of an application for a building permit creates a constitutionally protected property right is not supported in the majority opinion by citation to any authority. My research indicates that the authorities on the subject are to the contrary. The Court of Appeals of New York in 1930 affirmed a decision which restrained the defendant from erecting apartment houses by a zoning ordinance which became effective after the issuance of a permit for said construction but before any work had been commenced on the building. *Rice v. Van Vranken,* 225 N.Y. 541, 175 N.E. 304. It is interesting to note that the then chief justice of that court was Benjamin Cardozo. For a more recent decision adhering to the decision in *Van Vranken* see *Application of Kunz,* 128 N.Y.S. (2d) 680 (Sup. Ct. 1954). The authorities there cited make clear that the underlying basis for extending the protections of substantive due process to this sort of situation depends on the extent to which the applicant has taken steps in justifiable reliance on the permit, such as performing substantial work and incurring significant expenses and obligations. Similarly, where attempt has been made to commence an undertaking prior to the date of an ordinance declaring it to be a nonconforming use, the courts have applied the principal of the *Van Vranken* case to prevent this race to the courthouse where there has been no substantial commitment of resources in reliance on the preexisting law. *Smith v. Juillerat,* 161 Ohio St. 424, 119 N.E. (2d) 611; *Ohio State Students Trailer Park Coop. v. County of Franklin,* 123 N.E. (2d) 542 (Ohio App. 1953). Judged by these principles the plaintiffs have failed to show deprivation of any substantive rights. Article II, sec. 11 of the Constitution of Colorado prohibits only a law retrospective *in its operation.* As to these plaintiffs this ordinance is retrospective only in

form. They have attempted to exploit the law rather than justifiably rely on it.

In conclusion, it is my opinion that the ordinance should be upheld and that we should determine that these plaintiffs have failed to establish that the ordinance, or any provision of it, operates to deprive them of any constitutional right. The mere fact that plaintiffs cannot, under the adopted plan, use the land so that they can make the maximum economic use of it does not justify the far-reaching and sweeping conclusion contained in the majority opinion. There cannot be a zoning plan applicable to all of the people of the city and having for its purpose the orderly development of the city which will at the same time permit every individual to use his property exactly as he sees fit. So long as the scheme itself is reasonable, it should be upheld. If particular individuals can show that a specific provision is unreasonably oppressive, it then becomes appropriate to strike down that particular provision. The present plaintiffs have failed to demonstrate the impossibility of their living and prospering under this ordinance. The judgment of the district court should be reversed and the denial of the building permit by the zoning administrator should be upheld.

MR. JUSTICE DAY concurs in this dissent.

MR. JUSTICE DAY dissenting:

Probably more has been written in this case than is necessary or desirable. Nevertheless it should be considered that in approaching this problem my brethren have given scant attention to the right of the people of Denver to govern themselves, the fundamental concept of our democracy. The people of Denver in their charter, which is their own home rule "constitution," by free ballot have expressed themselves as to how their own property should be used for the benefit of all of them. This they can do in local matters if the charter itself is

not violative of the state constitution. This charter has been quoted but not upheld. Yet every power they have granted and the purposes and objectives they have enumerated do not violate the constitution. In it the people have given to their city council *authority* to enact ordinances to carry out the intent and purpose and objectives of the charter. The people have set forth the purposes, all of which fit very well within the powers reserved to them in governing themselves. While it is true that the people cannot by vote impose upon an electorate restrictions that are clearly unconstitutional, their vote is particularly helpful in this case because of the duty imposed upon the judiciary to give constitutionality to their enactments if at all possible. The public welfare, toward which end the people may enact laws under the police powers, is subject to a narrow construction as in the majority opinion or to a liberal construction as in the states which have upheld the constitutionality of off-street parking ordinances. So we do not have a situation here where the unconstitutionality of the ordinance is clear-cut, unequivocal, and beyond reasonable doubt. Such ordinances have been so universally adopted and accepted by other communities — 265 of them — that we think the vote on the charter was meant to convey to a doubtful judiciary what was to be the public policy of Denver in regard to problems affecting its future growth. If a free people cannot go to the polls and by their vote regulate the orderly development of their own city, and their own neighborhoods, then we have taken away from them far more than is attempted to be given by the majority opinion. The people have set forth quite explicitly what they think is good for the whole. They are now told, not by a benevolent despot but by a solicitous judiciary, what is really good for them.

The English poet, William Cowper, wrote of Robinson Crusoe and his life alone for five years on a desert island:

"I am monarch of all I survey —
My right there is none to dispute;
From the centre all round to the sea,
I am lord of the fowl and the brute."

This may have been all right for Robinson Crusoe, but if there are great numbers of Robinson Crusoes in a home rule city, can each proclaim such right? I think not.

Writing of two shipwrecked passengers also cast on a desert isle, W. S. Gilbert, in his delightful ballad telling the story of the foundering of the Ballyshannon and the drowning of all the passengers except Gray and Somers, wrote:

"These passengers, by reason of their clinging
 to a mast,
Upon a desert island were eventually cast.
They hunted for their meals, as Alexander
 Selkirk used,
But they couldn't chat together — they had
 not been introduced.
 * * *
And somehow thus they settled it without a
 word of mouth
That Gray should take the northern half
 while Somers took the south."

It is the purpose of the poet to demonstrate that as soon as two people are thrown together and are likely to conflict, some regulation is in order. Though Gray and Somers may have been able to divide the island "without word of mouth," a growth in population would have required a clear understanding of the rights and duties of each. These rules, as now expressed in charters and ordinances, were necessary to protect the people and to promote their common good.

Some of the specific grants of power given by the people in their vote to their own elected city council, which appear now to be of no effect, are: To regulate

and restrict the size of buildings and other structures, the percentage of lot that may be occupied, the size of yards, courts and other open spaces, the density of population, *the use of buildings, structures and land.* Among the expressed purposes specifically sought to be accomplished by zoning regulations and the charter — all, in my opinion, constitutional — were: To provide a comprehensive plan designed to lessen congestion in the streets, to secure safety from fire, panic and other dangers, to *prevent overcrowding of land* and to *avoid undue concentration of population,* to facilitate adequate provisions of transportation. The people and their comprehensive plan to prevent a duplication of or a compounding of the conditions prevalent in the downtown area (which developed unrestrained and which cannot be undone now) are to be held for naught.

The history of Denver, beginning with the years of no regulation in the use of property or in the size of the construction thereon, followed by the decades of inadequate ordinances and the deadly blows some of the decisions of this court struck at attempts to legislate in the field, has left the city with many scars. Judicial notice can be taken of what is plainly visible and of common knowledge. Our early fathers and the rugged individualists of pioneer days, most solicitous of the individual property rights, created a city which has been having a great struggle to meet the demands of growth. As a consequence of this individualism, there are encountered in every district dead-end streets, streets blocked by buildings and houses erected on the individual whim of the property owner without regard to contiguous plats, existing streets or adjacent property development. Opposition to or lack of uniform set-back requirements, all urged in the name of freedom of use, created conditions where streets cannot be widened, or, if they are, the movement of traffic splashes snow and water on the front stoop. Areas now designated as "blighted," heavily dotted with buildings standing vacant or, in many in-

stances, commanding only nominal rents, attest not to the fact that the buildings are many years old, for many are well built and functional, but rather they stand as monuments to the lack of planning (such as was hoped to be achieved by the charter) which permitted buildings and houses to be jammed up one against the other. It was inevitable that under such circumstances the very owners themselves closed their property and in some instances sold for the best price obtainable. The colossal waste is apparent everywhere, and there is scant comfort in the present day that these "protected properties" now are looking to the federal government for a proposed program of urban renewal whereby their property will be purchased, torn down, and others will be given a chance to commence anew. But what value will be the new start if the area is developed under old concepts? If this potentially fine city in the next seventy-five years is to be allowed to develop with little more plan, legislation or restraint than were the downtown areas east and south from the river to Broadway, it doesn't tax the imagination to picture the catastrophic consequences.